William W. Howard, Appellee, v. Baltimore & Ohio Chicago Terminal Railroad Company, Appellant.

Gen. No. 43,279.

84

Heard in the second division of this court for the first district at the December term, 1944. Opinion filed November 6, 1945. Rehearing denied November 20, 1945. Released for publication November 20, 1945.

RAWLINS & WRIGHT and E. W. LADEMANN, all of Chicago, for appellant; JAMES F. WRIGHT, of Chicago, and F. W. JOHNSON, of counsel.

JOSEPH D. RYAN and LOUIS P. MILLER, both of Chicago, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

This is an appeal from a judgment in a personal injury case upon a verdict of the jury finding defendant guilty and assessing plaintiff's damages at $50,000. It was stipulated that at the time of the accident defendant was engaged in interstate commerce and transportation and in intrastate commerce and transportation and that plaintiff was then an employee of defendant and in the performance of his duties in interstate commerce. The complaint is based solely upon the Federal Employers' Liability Act and the Federal Safety Appliance Act, and the right of action is predicated upon an alleged violation of the said Appliance Act. In cases brought in the State courts under these statutes the law announced by the Federal courts that bears upon said statutes is controlling. (See *Bailey v. Central Vermont Ry.*, 319 U. S. 350.) Under the said Acts neither contributory negligence nor assumption of risk can be interposed as a defense.

Plaintiff states his theory as follows: "Plaintiff's theory is that he [a switchman] was required to open the knuckle on a standing freight car, so that a moving car could be coupled to it. He attempted to operate the pin lifter in the usual manner, but the apparatus, being defective, stuck and the pin could not be raised. After repeated unsuccessful attempts, plaintiff finally stepped over with one foot between the rails, and attempted to operate the pin lifter (which normally hangs down in a vertical position and if operating properly opens the knuckle when it is pulled back or up eight or ten inches—to an angle of about 45 degrees) with his left hand, while pulling on the knuckle with his right. While plaintiff was in this position and while pulling the pin lifter with his left hand it suddenly 'flew' up, to a point far higher than normal—three inches above the horizontal—and plaintiff was thrown off balance and upon the ground between the tracks"; that after he fell he was struck by the approaching hopper car and thereby suffered serious injuries.

Defendant states its theory as follows: "It was defendant's theory of the case that plaintiff's accident and injuries were not incident to a defective coupler and coupling operation within the meaning of the Safety Appliance statute; that plaintiff's negligence was the causal negligence; and that the verdict was against the manifest weight of the evidence."

At the time of the occurrence plaintiff worked for defendant as a switchman. He had been in its employ for twenty-three years. The accident occurred on February 21, 1943, about 12:30 a. m., in defendant's McDonald yard, near Chicago Heights. The night was dark. "The weather was . . . just about freezing." There were no artificial lights in that part of the yard where the accident happened. Before the accident a number of preliminary movements of cars were made by the train crew of which plaintiff was a

member, but it is not necessary to detail these movements, as they played no part in the accident. Just prior to the accident the crew were moving an engine and two cars attached to it toward a string of twelve standing freight cars for the purpose of coupling them. The twelve cars were standing on track No. 1, where they had been left by another crew. The engine, facing north, and the two freight cars attached to it were being moved backward in a southerly direction along track No. 1 toward the twelve standing cars. The two cars attached to the engine were south of it. The more southerly one was a hopper car. It was necessary to couple the south end of this hopper car to the north end of the most northerly of the twelve standing cars, which was a box car. As the twelve standing cars were some distance from the engine plaintiff got on the southerly car of the two attached to the engine in order to ride toward the standing cars. At that time the engine was moving at a speed of about four or five miles an hour. Plaintiff was riding the southeast end of this southerly car, which would be the left-hand corner if one faced the direction in which the car was moving. He was standing on the stirrup and hanging on a handhold. On all freight cars only the left-hand corner is equipped with a stirrup and handholds. On the right-hand corner is the ladder by which the car can be climbed, and also the pin lifter by which the knuckle is opened and coupling effected. It was necessary for plaintiff to ride the southeast corner of the car because the engine was headed north, which placed the engineer on the east side of the train, and the signals between the engineer and plaintiff had to be given from that side. Plaintiff gave the signals by means of his lantern. The testimony of both sides shows that ''it is necessary in order to couple cars together to have one knuckle on one car open.'' The knuckle on the car which plaintiff was riding was closed and as the pin lifter was on the opposite side of the car it was impos-

sible for him to open the knuckle from the position he was then in. When the car on which plaintiff was riding was about five car lengths from the standing cars, he signaled the engineer to reduce his speed, and it was cut down to two or three miles per hour. Plaintiff did not know whether the knuckle on the standing car was open or closed. If it was closed it would be necessary for him to open it and prepare it for the coupling before the moving cars arrived, and therefore he stepped off the stirrup when the standing cars were about four car lengths away and walked rapidly toward said cars. He reached the standing cars while the moving cars were still some distance away. He found that the knuckle on the nearest standing car was closed and he grasped the pin lifter in his left hand and jerked it but it did not work and the pin failed to come up. He gave three more jerks upon the pin lifter but it did not operate. Satisfied that he could not open the coupler from outside of the rails, he then glanced at the moving cars and saw that they were still forty or fifty feet north of him, and, believing that he had ample time to adjust the couplers before the cars would impact, he put one foot between the rails and, holding the pin lifter with his left hand and holding the lantern with the thumb of his right hand, he reached in and grasped the knuckle with the four fingers of that hand. While in this position and while he was exerting pressure on the knuckle and the pin lifter the latter suddenly and without warning flew up and threw him off balance, and he fell on his back in the center of the track, about six or seven feet north of the end of the car. As he fell he hollered, but before he could get to his feet he was struck by some part of the leading truck or brake rigging on the moving car, and suffered the injuries for which he sues. After taking plaintiff to the hospital the conductor and the entire crew of which plaintiff was a member returned to the place on track No. 1 where the two cars and the twelve

cars had been left standing after the accident. The conductor, Schramm, and switchman, English, each made a test of the pin lifter on the north end of the most northerly of the twelve cars—the pin lifter that plaintiff was trying to operate at the time of the accident. Schramm testified that he tried the pin lifter a few times before it came up and when it finally came up "it went way up in the air" but did not open the knuckle. English testified that when the pin lifter came up it came up far above the horizontal, where it should have stopped; that when the pin came up the knuckle did not open and that in order to open the knuckle he had to reach in and open it with his right hand; that the pin lifter in its normal position hangs down vertically; that to pull the pin in order to open the knuckle the lifter must be raised to an angle of forty-five degrees, but must not be raised as far as the horizontal; that although the pin lifter on the car in question raised more than ninety degrees the knuckle did not open. The conductor also testified that the other members of the crew made the same tests and with the same results; that the crew then proceeded with their work, and that in order to make the coupling he found it necessary to hold the lifter up with one hand and open the knuckle with the other; that after they finally made the coupling he took the fourteen cars to Thornton, where he picked up some cars; that "I hung onto these two head cars, and went to Phoenix, and I set the two head cars at Phoenix, and picked up some. I don't know how many"; that he took the twelve cars to Blue Island and left them there, either on track number two or three. Defendant's witness Frank Flassig, a car foreman, testified that at five o'clock on the morning of the accident the yard master reached him at his home by telephone; that he was in bed at the time; that the yard master directed him to go to the Barr yard in Blue Island and make an inspection of the car in question; that he arrived at that yard

about six a. m. and found the car on track 15 in that yard; that he "never talked to the conductor or the switching crew that was handling that car that was working on it the night that Howard got hurt. I did not ever talk to any member of the crew. I did not ever get any specific information as to how the man got hurt"; that he made a thorough inspection of the car and found that it was O.K. in every particular; that after the inspection he ordered the car placed upon the repair track at Blue Island; that the car was kept out of service for three days but that no repairs were made upon it before it was put back into service; that on the morning of February 22 he and one of his car inspectors, Felix Duhoski, examined the car on the repair track at Blue Island; that no one else was there at the time; that Duhoski is under his control; that at the time of the examinations he had been told that there was a man hurt on the car but that he did not know whether the man "was thrown off the car from the roof of the car, from the stirrups or anything else"; that he never got any specific information as to how the man got hurt; that he had Duhoski make the inspection with him on the 22d because "it takes two men always to make an inspection for something like that"; that on the 22d he and Duhoski inspected the coupling device again and the pin lifter and found everything all right; that when he pulled up the pin lifter about 45 degrees it operated; that on the afternoon of February 22 they made running tests and the couplings on the car in question coupled on impact. Upon cross-examination the following occurred: "Q. Mr. Flassig, if that pin lifter, I mean if that handle, when you pulled it, not only went up as far as horizontal but went up to within 45 degrees of vertical again, would you consider it in proper working order? A. I would not. Q. There would be something wrong with it, wouldn't there? A. There would be. Q. And if it went up that far and the knuckle still remained

shut, then you would know there was something wrong with it? A. That is right. . . . Q. Now, if your pin lifting appliance is working properly, the knuckle can be opened by pulling it up to 45 degrees? A. That is right. Q. But suppose it shouldn't open, supposing the pin did go too far or the knuckle stuck. You could open it by hand, couldn't you? . . . A. You can, yes. Q. You have had experience in that very thing hundreds of times, haven't you? A. Yes, sir.'' Felix Duhoski, a witness for defendant, testified that he did not inspect the car with Flassig when it was on track 15 in Blue Island nor did he see it there; that the first time that he saw the car it was on the repair track in the Phoenix yard near Harvey; that it was then about one o'clock p. m. on February 22, 1943; that at that time, in company with Foreman Flassig, he made a thorough inspection of the car; that he inspected the coupler and pin lifting device on the car by using the pin lifter; that the pin lifter and the coupler were in good working order; that he did not pull the pins on the car while the locomotive was attached to it but that he observed men doing that; that the handle of the pin lifting device when the pin is down and in place is straight down; that when he pulled the handle up it pulled up forty-five degrees from the vertical from the bottom; that it did not at any time go past the horizontal position but it has to be disconnected to go up in the air. Upon cross-examination he testified that nobody had told him that an accident had happened to a man in connection with the car in question, that his attention had not been called to the fact that the pin lifter and coupling appliance was out of order; that he had nothing in particular in mind when he made his examination; that he does not know that anything had been done to the car before he inspected it; that Mr. Flassig ordered him to inspect the car. John P. Burgert, a switchman, employed by defendant, and Edward C. Gaertner, a yard foreman, also employed by defendant,

testified that they were present when the running tests of the car were made in Harvey on the afternoon of the 22d; that the coupling appliances on each end of the car in question worked perfectly; that they coupled by impact and without the necessity of a man going in between the ends of the cars to adjust the knuckles of the couplers. Upon cross-examination the witness stated that he did not remember the day when he made the inspection but the gentleman told him it was the 22d; that he had no idea as to the date when he made the inspection. He further testified that he had had a lot of experience in coupling and that once in a while they stick; that dirt and rust would cause a coupler to stick. During his examination the following occurred: "Mr. Ryan [attorney for plaintiff]: Q. Haven't you had it happen to you dozens and dozens of times in the course of the years when these couplers stick on account of dirt and rust, where you have to step in and open the knuckle by hand? A. We walk around the car and cut it from the other side. Q. Did you ever open a knuckle with your hand? A. Yes, sir. Q. Hundreds of times, haven't you? A. Frequently. Q. And that is because they don't work, that makes you do it, isn't it? A. They stick once in a while. Q. You are not stepping in there unless you have to, to open the knuckle, do you? A. Well, just to speed up the work. . . . Q. But you do know that if a pin lifter went up beyond the horizontal, 45 degrees, that there is something wrong with it, don't you? A. Yes, sir. Q. If it went that far up and the knuckle stayed closed, you would know there was something definitely defective about it, wouldn't you? A. Yes, sir. Q. You don't know what was done with that car before you made this test of it, do you? A. No, sir." Defendant also called as a witness Maurice C. Murphy, who testified that he was the freight agent, station agent and acting yard master for defendant in Harvey, Illinois; that he keeps records of all cars moving through his

immediate area; that his records show that the car in question "was set out by run 215, conductor A. H. Schramm, at 3:30 A. M. the morning of February 21, 1943"; that "the car was set at Bliss & Laughlin, one of the industries at Harvey, for loading at 3:15 A. M. on February 24th by Conductor G. B. Gertner. The car was pulled from Bliss & Laughlin, loaded at 4 A. M. on the 25th by Conductor G. B. Gertner. The car moved to our Blue Island Yard on Conductor Nestrick at 7:30 P. M. February 25th. Car moved to St. Paul at Western Avenue at 3:45 A. M., leaving Blue Island, Conductor Lester, February 26th." The witness further testified that at 8:30 a. m. February 21, when he reached his office, one of the clerks working in the office called his attention to the fact that there was a car in his yard that "one of the switchmen had got hurt on"; that he went out to look at it. The car "was set out on what we call our extension track between Halsted and Vincennes Avenue"; that the car was not repaired at his yard at any time, because if a car had been repaired in his yard the records would show it and that he had no record of the car in question being repaired during the time that it was in his yard; that he did not reach the yard on February 21 until about 8:30 a. m.; that when he saw the car in question, about 10 o'clock a. m. on the 21st, it was standing singly, that the car looked all right to him but that he did not take hold of the pin lifter and try to operate the coupler. The following then occurred: "Mr. Ryan: Q. Did you do anything more than take a look at that car when you saw it that morning in the Harvey yard? A. No, sir." From the record it appears that defendant made no attempt to prove that the condition of the coupling apparatus upon the car in question at the time that its witnesses examined it was the same as it was at the time of the accident. Nor did it introduce as witnesses the men who moved this car around from one track to another.

■ Defendant contends that the court erred in giving to the jury plaintiff's instruction number two. This instruction defines the issues and informs the jury under what facts they might return a verdict for plaintiff. Defendant argues that the instruction was prejudicial because "the complaint sets forth the pleader's own conclusions of facts, and these conclusions, coming to the jury from the judge, import a verity to these conclusions which carries great weight· with the jury since they emanate from the office of the trial judge." Defendant cites *Cooney v. Hughes,* 310 Ill. App. 371, where instructions like the one in question were criticised. While the First Division of this court in that case did criticise instructions like the one before us, nevertheless, the court stated (p. 383), "in so far as the briefs inform us the courts of this State have not thus far reversed a judgment for this cause. We think the jury here was not misled. The facts were simple, the issues easily understood." The judgment for the plaintiff was affirmed. Upon the question of liability in the instant case, because of the stipulation of facts entered into by the parties and the effect of the Federal laws that apply to this suit, a simple, readily understandable issue was presented to the jury, viz., Was the plaintiff injured because of a defective coupling appliance while he was attempting to adjust the appliance in order to effect a coupling? After the opinion was rendered in the *Cooney* case, the Supreme court, in *Goldberg v. Capitol Freight Lines,* 382 Ill. 283, had before it an instruction identical with the one before us, and in passing upon it the court said (p. 292): "While unnecessarily lengthy, the instruction so given was not improper. Similar instructions, equally, if not more, verbose in form, while criticized, have been held not to constitute error. *Reivitz v. Chicago Rapid Transit Co.,* 327 Ill. 207; *Liska· v. Chicago Railways Co.,* 318 id. 570; *West Chicago Street Railroad Co. v. Lieserowitz,* 197 id. 607." Defendant also contends

that the instruction charged that the couplers failed to couple on impact, and that there is no proof that the couplers failed to couple by impact. It would be a sufficient answer to this contention to say that the instruction does not charge nor assume that the couplers failed to couple by impact. Defendant states that the evidence shows that ''the oncoming car stopped too short of the standing car for a coupling by impact.'' This statement is not warranted under the facts and circumstances in evidence. While the cars were found uncoupled after the accident, Conductor Schramm testified that when he made his tests on the pin lifter, after the accident, ''there was a few inches of space between the south end of the most southerly car and the north end of the north car of the twelve''; that when he operated the pin lifter the knuckles did not open, and his evidence shows that in his attempt to couple the cars he had to do the very thing that Howard was attempting to do at the time of the occurrence. From all of the facts and circumstances the jury would have been warranted in finding that the two cars came in contact and that the couplers failed to work on impact. While plaintiff's fall happened before the two cars had an opportunity to come in contact, it is entirely immaterial whether or not the two cars came in contact at the time of the occurrence. Defendant's criticism of plaintiff's instruction number two is without merit.

█ Defendant contends that the court erred in giving to the jury plaintiff's instruction number three. This instruction is in the language of the Employers' Liability Act and the giving of the same did not constitute error. (See *Minnis v. Friend,* 360 Ill. 328, 338.)

██ Defendant contends that plaintiff's instruction number four, given to the jury, was erroneous and prejudicial. This instruction instructed the jury, in substance, that it was the absolute duty of defendant under the provisions of the two Acts in question to

equip its cars with couplers that would at all times couple automatically by impact, without the necessity of employees' going between the cars. Defendant contends that the instruction was erroneous and prejudicial because "in the first place it speaks of an absolute duty on defendant to have all cars equipped with couplers that would at all times couple automatically by impact without necessity of employees going between cars. In the first place, such is an abstract statement of the law which could not aid the jury in arriving at its verdict in this case. It could only confuse them because to them, probably, the use of the term 'absolute duty' would mean nothing else than that defendant was an insurer, and such is not the nature of the liability of defendant under either the Federal Employers' Liability Act or the Federal Safety Appliance Act." There is no merit in this contention. In *Atchison, T. & S. F. Ry. Co. v. Keddy,* 28 F. (2d) 952, 955, defendant made a similar argument as to an instruction which "charged the jury that it was the absolute duty of the defendant to equip the car with a coupler that would work automatically by rise of the lift pin lever at all times, and that, if they found that the coupler failed to operate at the time and place of the accident, and that the plaintiff in the performance of his duty went in between the cars to operate the same, and was thereby injured, it was immaterial whether the coupler was operated prior to or after the occurrence of the accident." The court held the instruction good. In *Davis v. Michigan Central R. R. Co.,* 294 Ill. 355, 359, the court held the duty imposed by the Federal Safety Appliance Act is an absolute duty. In *Philadelphia & R. Ry. Co. v. Auchenbach,* 16 F. (2d) 550, the court defined the duty as "absolute and unqualified." In *St. Louis & Iron Mountain Ry. v. Taylor,* 210 U. S. 281, 294, 295, the court said: "The Congress, not satisfied with the common law duty and its resulting liability, has prescribed and defined the duty by

statute. We have nothing to do but to ascertain and declare the meaning of a few simple words in which the duty is described. It is enacted that 'no cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard.' There is no escape from the meaning of these words. Explanation cannot clarify them, and ought not to be employed to confuse them or lessen their significance. The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just.''

Defendant, in support of its contention that the court erred in giving plaintiff's instruction number seven, argues that it is subject to the objections it made to plaintiff's instructions numbers three and four. We have heretofore disposed of these objections. It further argues that ''instruction 7 is fundamentally bad in that the instruction tells the jury that if plaintiff fell between the cars for any reason he is entitled to recover. Again, plaintiff would make defendant an insurer. Such is not the nature of defendant's liability under the Safety Appliance Act on cars coupling by impact as we have previously pointed out.'' It is a sufficient answer to this argument to say that the instruction does not contain the words ''for any reason,''. nor any similar words.

Defendant contends that the court erred in giving plaintiff's instruction number thirteen. The instruction reads as follows: ''13. If you believe from the evidence that any witness in this case has knowingly and wilfully sworn falsely on this trial to any matter material to the issues in this case, as elsewhere defined in these instructions, then you are at liberty to disregard the entire testimony of such witness, except in so far as it has been corroborated—if you find it has been corroborated—by other credible evidence or by facts and circumstances proved on the trial.'' The point made by defendant is that the use of the words

"to any matter material to the issues in this case," without explaining to the jury what facts are material, makes the instruction bad. *People v. Wells*, 380 Ill. 347, is cited in support of the contention. There the court said (p. 358): "Undoubtedly the rule is, that where this instruction is given, other instructions should be given defining the issues, so as not to throw the burden on the jury of ascertaining what are and what are not material issues of fact." In the late case of *People v. Lynn*, 387 Ill. 549, the court said (p. 554): "Other instructions explained to the jury the essential and material elements of the offense charged, and taking the instructions as a series the jury was not at liberty to determine its own standard of 'material facts' or 'material allegations.'" In the instant case the court gave plaintiff's instruction number two, which fully defined the issues in the case.

██ Defendant contends that the court erred in excluding from the jury certain of defendant's operating rules which prohibited employees from going between the cars, adjusting knuckles with their hands, etc. Defendant concedes, as it must, that these rules would not be received to prove contributory negligence or assumption of risk, but it contends that the rules were proper evidence to show that the causal negligence in this case was plaintiff's. Defendant apparently ignores the fact that this is an action under the Safety Appliance Act. The following answer, *inter alia*, by plaintiff to defendant's contention is a meritorious one: "Unless the supposed negligence of plaintiff was the sole cause of the accident, and the violation of the Safety Appliance Act played no part whatever in it, the rules would be immaterial, since plaintiff is entitled to recover if a violation of the Act contributed to his accident in any degree."

In *Chicago G. W. R. R. v. Schendel*, 267 U. S. 287, the decedent was killed while between the cars, trying to disengage a chain which had been substituted for a

defective drawbar. Among other defenses, the defendant relied on an admitted violation of a company rule which provided that employees should advise the engineer when going between cars, and must know that he understood their purpose before putting themselves in any dangerous position. The Supreme court, in passing upon the defense, stated (p. 292):

"The things shown to have been done by the deceased certainly amount to no more than contributory negligence or assumption of the risk, and both of these are removed from consideration by the Liability Act. When injured he was 'within the class of persons for whose benefit the Safety Appliance Acts required that the car be equipped with automatic couplers and drawbars of standard height. . . . His injury was within the evil against which the provisions for such appliances are directed.' . . . He went into the dangerous place because the equipment of the car which it was necessary to detach did not meet the statutory requirements especially intended to protect men in his position."

The recent case of *Scrimo v. Central R. R. of New Jersey,* 138 F. (2d) 761, was an action under the Safety Appliance Act, where the defendant introduced in evidence a safety rule which provided that if the cutting lever was defective the movement must be stopped before any attempt was made to adjust the coupler. The trial court charged that the violation of the safety rule was not an issue in the case and should not be considered by the jury, and the Circuit Court of Appeals held the charge proper, (p. 762) "since contributory negligence or assumption of risk are no defense if a violation of the Safety Appliance Act contributes to the injury or death." In the instant case there can be no doubt that plaintiff's evidence showed that a defective coupling apparatus which he was attempting to adjust in order to effect a coupling proximately contributed to his injuries, and, therefore, the admission

of the rules would only tend to confuse and mislead the jury.

Defendant contends that "the verdict was against the manifest weight of the evidence." This contention assumes that plaintiff made out a *prima facie* case. We have heretofore stated the material evidence in the case. In *People v. Hanisch,* 361 Ill. 465, 468, the court said: "Whatever may be the rule in certain other jurisdictions, we firmly adhere to our often-asserted belief that it is the province of the jury, alone, to determine the weight of the evidence and the credibility of witnesses. If it were not so there would be little use for the jury system. The jury, as a fact-finding body, is of such importance that an abridgment of its functions in this regard and an appropriation of them by the judges would mean the forsaking of a valued tradition in our system of jurisprudence. The utmost caution should be exercised not only by the trial courts but by the reviewing courts to uphold the sanctity of the trial by jury." All believers in the jury system must heartily approve this statement of our Supreme court. But we are not obliged to rely upon the rules laid down in the *Hanisch* case in order to sustain the verdict of the jury in the instant case, because, after a careful review of the evidence, we find ourselves in full accord with the verdict of the jury upon the question of the liability of defendant.

Defendant next contends that "the verdict was for an excessive amount." Plaintiff was about fifty-one years of age at the time of the occurrence and had been working continuously for defendant for twenty-three years in the capacity of switchman or conductor. The evidence shows that he was a steady worker, who often worked overtime. Prior to the occurrence his health had always been good and he had never suffered any serious injury. After the accident he was at several hospitals and was treated by at least four doctors, all of whom were employed by defendant, and it paid all

hospital expenses and all fees charged by the doctors. Plaintiff testified that after he fell some part of the brake rigging underneath the first truck struck his head and "knocked me out momentarily"; that when he came to "I was laying on my back and my head underneath the brake rigging, and the wheels standing on my pants leg. My left arm was smashed off," and "the car hit me in the head, tearing my scalp off"; that when he got to the caboose the conductor tried to stop the blood that was flowing by tying a rope around his arm, making "a sort of tourniquet." Plaintiff was then taken to a hospital in Chicago Heights and there it was found that the wheel of the car had run down his arm from his elbow to the hand; that that part of his arm was so crushed that Dr. Donaldson cut off that part with a pair of scissors; that the cut was made "right through the elbow." Plaintiff remained at that hospital for two weeks and during that time his arm "was terribly sore and pained me. . . . The stump was discharging," and he was nervous and run down from the shock. He was under Dr. Donaldson's care for about four weeks, during which time he did not sleep well. On April 30 Dr. Donaldson "transferred" him to Dr. Rauschenbach, at Hammond. That doctor, in his treatment of plaintiff, took X-rays of plaintiff's head and arm. Dr. Byrne, "a B. &. O. doctor," then attended plaintiff and finally sent him to St. Luke's hospital to have Dr. Mock examine him. Plaintiff testified that his arm "healed up ultimately," but that he thinks he still feels some pain in the hand that was amputated; that he very frequently had pains in his head; that "I still have, very frequently have pains and headaches and dizzy spells"; that "last April" (the trial commenced May 31, 1944) he had a dizzy spell and fell in the street and had to be taken home in an ambulance. Plaintiff further testified that he was injured "right on top of the head, in the front, right here (indicating)," about at the hair line; that

as a result of the accident he has a scar on his forehead. Plaintiff also testified that in 1940 his earnings totaled $3,094.95; in 1941, $3,291.14, and in 1942, $3,984.38; that for the thirty-five days he worked in 1943 he earned $586.98; that since his accident wages of a switchman have been increased nine cents an hour. As plaintiff's health prior to the accident had always been good, at the time of the accident he might reasonably have looked forward to many years of employment, and the evidence is conclusive that prior to the accident he was a steady, hard worker. Plaintiff contends that ''in fixing the amount of damages, the jury might properly take into consideration the depreciation of the currency and the rising cost of living.''·

In *Bowes v. Public Service Ry. Co.* (N. J.), 110 Atl. 699, 700, the court said: ''The word 'excessive' has a relative meaning. . . . At a period when the purchasing power of the dollar has in the language of the day been 'cut in half,' the value of the sum awarded here is not to be estimated in the numerical quantum of the recompense, but in its comparative ability to furnish the necessities of life. Of these facts the court must take judicial notice.''

In *Quinn v. Chicago, M. & St. P. Ry. Co.*, 162 Minn. 87, 90, 202 N. W. 275, 276, the court said: ''In recent years there has been a noticeable increase in the size of verdicts in personal injury cases. The courts approve of verdicts today which would have been unhesitatingly set aside as excessive 10 or 15 years ago. Measured in money, the earning capacity of most men has increased; measured in purchasing power, the value of a dollar has decreased. No immediate change in the situation is in sight. It is only right that these well-known facts should be taken into consideration.''

In *Weadock v. Eagle Indemnity Co.* (La.), 15 S. (2d) 132, 146, the court said: ''. . . the decreased purchasing power of the American dollar, with little or no prospect for any change, except probably further de-

crease, for many years, is a pertinent factor to be taken into consideration in determining the award.''

We have often recognized, in passing upon the amount of damages awarded, the decline in the purchasing power of money. To cite a few cases: *Posch v. Chicago Rys. Co.*, 221 Ill. App. 241, 254, 255; *Maskaliunas v. Chicago & W. I. R. Co.*, 235 Ill. App. 198, 221; *Ehrenheim v. Yellow Cab Co.*, 239 Ill. App. 403, 409; *Lagatutte v. Chicago Daily News Co.*, 239 Ill. App. 675 (Abst.); *Foreman Brothers Banking Co. v. Consumers Co.*, 226 Ill. App. 662 (Abst.). Many other cases to the same effect might be cited, but we note that defendant, in its reply brief, does not attempt to answer plaintiff's argument upon the instant point. There is merit in plaintiff's argument that in his present physical condition he must invest his money in safe securities, and that a three per cent return would be the highest yield compatible with safety. Defendant does not question plaintiff's further contention that he is entitled to substantial damages for pain and suffering, nor does it dispute plaintiff's further contention that he is entitled to recover for deprivation of the privileges and enjoyments common to men of his class and that defendant's wrongful act had deprived him of such privileges and enjoyments. Defendant does not dispute plaintiff's claim that his days of active railroading are over, but it contends that ''the court erred in refusing an offer of proof by defendant that plaintiff could continue in the employment of the defendant''; that ''the refused testimony on plaintiff's capacity and opportunity to stay on with the company as a switch-tender was a material factor to lower the verdict down to a more reasonable level than $50,000.'' While defendant was putting in its case its counsel made an offer to prove that if R. F. Jetter were called as a witness he would testify as follows: ''That he is now and, was at the time of the happening of this accident and had been for a long time prior thereto the

assistant superintendent of the Baltimore & Ohio Chicago Terminal Railroad Company. That on June 17, 1943, he, together with C. M. Haugh, trainmaster of said railroad, called at the home of the plaintiff, in Hammond, Indiana, and informed Mr. Howard of his eligibility to his choice of five positions as switchtender for the defendant company at East Chicago, Indiana. All of these switchtender's positions work seven days per week. I offer to prove further by this witness, R. F. Jetter, that nothing was said at all at that time about this litigation, if it was then pending—I am not sure whether it was or not; that nothing was said about his claim against the company or about any suit against the company, but that he was offered this position, which he could have taken if he had desired to do so.'' The counsel also made an offer to prove by C. M. Haugh, trainmaster of defendant, ''that he, in company with Mr. R. F. Jetter, the assistant superintendent of said railroad, went to the home of the plaintiff on June 17, 1943, and informed Mr. Howard that he was eligible to go to work for the Baltimore & Ohio Chicago Terminal Railroad Company as a switchtender at East Chicago; that there were five positions open and that he could have his choice of any one of those five positions, and that all of those positions worked seven days per week. That at that conversation, at that time and during that conversation, the plaintiff was informed that he could take any one of these positions and that nothing was said at all about his claim against this railroad company or about any suit that he might then have or might subsequently have against the company because of any injury that he might have received at any time.'' Plaintiff's counsel stated that his objection to both offers went to the substance of the offers. Prior to the making of the two offers there had been considerable discussion between the court and counsel for both sides as to the admissibility of the alleged offer of employment.

Plaintiff's evidence strongly tended to prove that he was not physically able to take care of the job that defendant claims it offered him, and defendant did not see fit to produce nor offer to produce evidence to contradict that evidence. During the discussion the court stated that before such evidence would be competent defendant would have to show by evidence that plaintiff at the time of the alleged offer was physically able to do the kind of work required by the job that was offered him. Counsel for defendant appeared to agree with the court's statement of the law, as the following shows: "Mr. Wright [attorney for defendant]: Your Honor, I can show, not by this witness [plaintiff]—of course I cannot do it all at once, *but I can show that he is—was at this time and is now capable of taking care of a switch tender job, physically able to do it.* Mr. Ryan [attorney for plaintiff]: *How are you going to show that?* Mr. Wright: *By a doctor.* The Court: By what? Mr. Wright: A doctor. Mr. Ryan: Put him on, then. Mr. Wright: Well, I can't do it now. Mr. Ryan: Well, I object. Mr. Wright: Well, you have got to wait. The Court: That would be proper. Mr. Wright: Yes." While the court made it very plain that defendant would have to make a showing that plaintiff was physically able to do the work required by the offered job before the offer would be admissible, the court never refused defendant an opportunity to offer such proof. Indeed, the court stated that if plaintiff was physically capable of earning money defendant would have a right to show that jobs were open to him. Neither of the two formal offers of proof that defendant made contains any offer to prove plaintiff's physical condition at the time the offer was made. The only reasonable inference that can be drawn from the record is that defendant was unable to prove by Jetter and Haugh that plaintiff at the time of the offer was physically able to accept their offer. *A fortiori,* the fact that defendant failed to call any of

its doctors who attended plaintiff is very persuasive. The uncontradicted evidence is that at the time of the alleged offer plaintiff was under the care of one or more of defendant's doctors, that he was highly nervous, and had pains in his head, "headaches and dizzy spells." It was undoubtedly because of these "headaches and dizzy spells" that Dr. Rauschenbach took X-rays of plaintiff's head, but defendant's able and experienced attorneys did not see fit to call Dr. Rauschenbach, and the record is silent as to what the X-rays showed. We feel impelled to say that it is to the credit of the company doctors who attended plaintiff that they did not give evidence to support defendant's present contention that plaintiff, at the time in question, was physically able to perform the duties of the offered job. Under the undisputed evidence, it would have constituted an act of criminal negligence for defendant to place plaintiff, in his physical condition, in the job of switch tender at East Chicago. We also agree with the statement of the trial court in passing upon the admissibility of the offered evidence that the evidence offered, if admitted, would only tend to lead the jury into the field of conjectures and speculations. The trial court also called attention to the fact that the offer was not a promise to plaintiff that he was to have permanent employment. Under the alleged offer defendant would have had a right to discharge plaintiff at its pleasure. In fixing damages, how could the jury, under the offered evidence, determine how long the offered job would last? The ruling of the court sustaining plaintiff's objection to the offered evidence was proper. After a careful consideration of the evidence bearing upon defendant's contention that "the verdict was for an excessive amount," we are satisfied that we would not be justified in disturbing the amount awarded by the jury.

In our judgment, a simple case is presented by this appeal, although the able and astute attorneys for defendant have labored to make the case appear

complicated by raising and arguing many contentions, none of which, when analyzed, possesses any real merit. A study of the record satisfies us that this case was well tried, and that defendant has had a full and fair hearing. The judgment of the Circuit court of Cook county is affirmed.

*Judgment affirmed.*

FRIEND, P. J., and SULLIVAN, J., concur.