**Marion Smith, Appellee, v. Illinois Central Railroad Company, Appellant.**

**Gen. No. 44,887.**

Opinion filed June 13, 1951. Rehearing denied July 16, 1951. Released for publication July 30, 1951.

JOHN W. FREELS, and HERBERT J. DEANY, both of Chicago, for appellant; VERNON W. FOSTER, and CHARLES A. HELSELL, both of Chicago, of counsel.

JAMES A. DOOLEY, of Chicago, for appellee.

MR. JUSTICE KILEY delivered the opinion of the court.

This is a personal injury action in which plaintiff had verdict and judgment for $185,000. Defendant has appealed.

On January 16, 1948, about 11 P. M., plaintiff, then twenty-four years old, was driving an automobile east on Third Street in Gilman, Illinois. His wife was riding with him. The automobile was struck by defendant's north-bound diesel-motored passenger train, the "City of New Orleans." Plaintiff's right leg was torn off and subsequently his left leg was amputated. He suffered

other injuries. His wife was also injured but she is not a party to the suit.

Gilman had at the time a population of 1600. Third Street was a main east-west street, though not a state highway. It was 20 feet wide and was paved with brick except for the slightly upward approach to the tracks, from the west, which was paved with asphalt. After crossing the tracks, Third Street led to Central Street, the principal north and south street. Central Street led to the town proper situated south of Third Street. There were five sets of tracks on the Third Street crossing. The westernmost was a switch track; the second, a mainline which curved southwest, south of the crossing; the third, the southbound main; next, the northbound main; and, finally, another switch track. In addition there were cross-over tracks between the second and third sets of tracks. Several tracks led to the west from the westernmost track. The first one led off 106 feet south, and the next one, 207 feet south, of Third Street. There was a grain elevator 343 feet north of Third Street, adjacent the westernmost track. The northbound and southbound main tracks were straight for two miles south of Third Street.

There was a railroad yard at Sixth Street, 1500 feet north, and the Gilman railroad station was about 1000 feet south, of Third Street. Immediately south of the station was the T. P. & W. Railroad right-of-way and, immediately south of that, a grade crossing. The roundhouse yards began about 200 feet southwest of the Third Street crossing. The westernmost track connected with the T. P. & W. tracks southwest of the crossing. The T. P. & W. tracks ran almost at a right angle with the Illinois Central right-of-way.

There were single-armed gates on both sides of the Third Street crossing. The west gates were 12 feet west of the westernmost track and were located on the

598

south side of Third Street. The gates were operated only between 7:45 A. M. and 3:45 P. M. under an order of the Illinois Commerce Commission. They were not in operation at the time of the accident. When not in operation the gates were locked in a raised position. On the east and west sides of the crossing were signs stating ''GATES NOT WORKING''. Defendant's practice was to cover these signs with metal shields during the hours that the gates were in operation. The shields were removed for the other hours. They were put on and taken off by defendant's tower man.

There was no artificial lighting and no flasher light warning device on the crossing itself. The nearest lights were 58 feet west, and 190 feet east, of the crossing. There was no bell on the west side of the crossing. There was an automatic bell 15 feet east of the easternmost track and just south of Third Street. It was operated by controls in the tracks. The control on the northbound main was 3639 feet south of Third Street. The control was designed so that the bell would ring continuously from the time the first locomotive wheel passed over the control until the last car had passed Third Street.

The verdict implies that the jury found plaintiff was in the exercise of due care and defendant was guilty of negligence proximately causing plaintiff's injury. The complaint charged general negligence in operation of the train and in maintenance of the crossing. It also charged that defendant was guilty of one or more of the following specific acts of negligence: failure to have gates in operation as the train approached and traversed the crossing; failure to have a watchman on duty; placing boxcars so as to obstruct the view of those travelling eastward over the crossing; failure to have bells, lights or other warning devices in operation; and operating the train at a dangerous and excessive rate of speed.

Defendant contends that the court should have directed verdict and entered judgment for defendant because plaintiff did not use due care, and defendant was not negligent, as a matter of law. It contends that, in any event, the judgment must be reversed and a new trial ordered because of error in the admission of testimony and in giving instructions; because of improper and prejudicial argument, resulting in a grossly excessive verdict; and because the verdict is against the manifest weight of the evidence.

■ We take the evidence in plaintiff's favor as true and draw the reasonable inferences most strongly in his favor, in determining whether there is any evidence tending to prove the exercise of due care. We do not consider unfavorable testimony developed by defendant, either in cross-examining plaintiff's witnesses or in defendant's case. Undisputed facts and indisputable physical facts are necessarily considered in order to understand the context of the accident.

During World War II plaintiff was a driving instructor in the Marine Corps. For some time prior to the accident he had been employed as a mechanic in the Chevrolet garage in Gilman. This garage was located on Central Street and two blocks south of Third Street. During this period he lived at a hotel a half block east of Central Street and three blocks south of Third Street. On the night of the accident plaintiff had driven from his home in Crescent City to Gilman, a distance of seven miles, for the purpose of visiting his mother who lived west and north of the Third Street crossing. He was driving a 1936 model Chevrolet sedan purchased in October 1947. Upon leaving his mother's home, shortly before 11 P. M., he turned east onto Third Street and drove toward the railroad crossing at about 15 miles an hour. He had never before driven over the crossing at night. He did not

know there was no watchman on duty or that the gates were not in operation. He had seen the gates in operation in the daytime. He did not see the "GATES NOT WORKING" sign at the right of the pavement as he approached the crossing.

 Defendant argues that plaintiff's testimony that he was unfamiliar with the Third Street crossing is inherently improbable and should be disregarded under the holdings in *Kelly v. Jones,* 290 Ill. 375; and *Briney v. Illinois Cent. R. R. Co.,* 330 Ill. App. 250. It is clear from the first case cited that the reason for disbelief must arise from the testimony of the witness whose testimony is questioned. In the *Briney* case we said the inherent improbability should appear without reference to defense testimony. We see no inherent improbability in the testimony favorable to the plaintiff on this question. The same is true of the testimony, hereinafter considered, of the presence of boxcars on the westernmost track and south of Third Street. The testimony by and for plaintiff with reference to his not seeing the sign, considered alone, is not inherently improbable.

 The defendant contends that plaintiff, as a matter of law, is chargeable with having seen the "GATES NOT WORKING" sign. The sign was located about two feet south of the right-hand side of the street as plaintiff approached the crossing. It was 12 feet west of the gates and 24 feet west of the westernmost track. The only artificial light in the vicinity, other than plaintiff's headlights, was the suspended street light about 35 feet west of the sign. The night was dark and misty. The sign was not illuminated in any way and had no reflector buttons. There was testimony that the sign was "dirty, sooty, and peeling". The sign measured three feet by four feet and was attached, a few feet from the ground, to a darkened post. The lettering on the sign was black. The

601

background for the lettering was gray with a black border. About six feet east of this sign was the customary, tall railroad crossing sign and, a few feet east of that, the upraised gate-arm.

The only photograph in the record which complements the above testimony was taken with a camera facing east on Third Street. It was taken at noon on January 17, 1948. There is no photograph, and no other testimony which we can consider on this question, indicating the visibility of the sign at night. After a thorough examination of this photograph in the light of the foregoing evidence, we think that, from a point of view which might have been plaintiff's, the sign in the photograph merges into its background and is not distinct. According to the photograph and from this viewpoint, the "GATES NOT WORKING" sign, the tall, white railroad crossing pole and the upraised gate-arm seem to be in the same plane. The east and west distances between the sign, the pole and the black and white upraised gate-arm are not discernible. Our conclusion on this hard question is that we cannot say that all reasonable men would agree that plaintiff should have seen that sign.

The next question is whether all reasonable men would agree that plaintiff was guilty of a lack of due care in failing to observe the approach of the "City of New Orleans" while driving the 55 feet after passing the westernmost track until the collision, and, upon such observation, in failing to avoid the collision. We apply the favorable evidence rule.

The crossing gates were upraised and plaintiff had no notice of the custom of locking them upright at night. There were no lights or visible warning signs. The warning bell on the east side of the crossing did not ring and the train bell and whistle were not sounded. Under these circumstances he faced the necessity of crossing the tracks. Within 50 or 60 feet

602

of the tracks he had observed boxcars on the western-most track, the northernmost car located about 60 feet south of Third Street. Another group of boxcars was located about 200 feet north of Third Street. As he came to the first rail of the westernmost tracks, he decreased his speed to about five miles an hour, shifted into second gear and started going across the tracks. He looked to the right but his vision was obstructed by the boxcars. He then looked to the left and saw a loco-motive headlight about 500 feet north of Third Street on the second track. He entered the second track and saw another headlight farther north on the third track. He increased his speed to about eight miles an hour while continuing to watch the headlights approaching from the north. He did not observe the "City of New Orleans" until about the instant of the collision. The right rear of plaintiff's automobile was struck.

Plaintiff could stop his car in five to eight feet while travelling at a speed of eight miles an hour. We doubt that all reasonable men would expect him to stop his car after he had come to the second or third track even if he then had notice of the northbound train. The headlight on the locomotive on the second track was moving slowly toward him. His car was "bathed" in the glare of the light thrown by the locomotive on the third track. This train was moving toward him at 35 miles an hour. He might have considered stopping in mid-crossing disastrous. We cannot say all reasonable men would say he was imprudent in not stopping before reaching the second track. The gates were up-raised. Plaintiff lacked knowledge of the approach of the "City of New Orleans". He saw the headlight of the locomotive moving slowly on the second track. We think some men would say he did the prudent thing, under the circumstances, in moving across the second track. Should he have increased his speed to a greater degree than he did? The answer is that he

603

had attained sufficient speed to clear the danger presented by the approaching locomotives of which he had notice.

*Elliott v. Elgin, J. & E. Ry. Co.*, 325 Ill. App. 161; *Greenwald v. Baltimore & O. R. R. Co.*, 332 Ill. 627; *Robertson v. New York Cent. R. Co.*, 388 Ill. 580; and *Swenson v. Chicago M., St. P. & P. R. Co.*, 336 Ill. App. 287, cases relied upon by defendant, aside from the general rules therein, are not helpful to our decision upon this question because of the different factual situation in the instant case.

 The general rule is that it is the duty of persons about to cross a railroad track to look about them and see if there is danger, and not to go recklessly upon the track but to take proper precaution to avoid accident. *Greenwald v. Baltimore & O. R. Co.*, 332 Ill. 627. But a traveler on the highway who is approaching or traversing a railroad crossing has not the absolute duty to look or to see an approaching train. *Chicago & A. R. R. Co. v. Pearson*, 184 Ill. 386; *Stack v. East St. L. Ry. Co.*, 245 Ill. 308. Where there is evidence excusing the failure to look, the question of plaintiff's imprudence is for the jury. *Chicago & A. R. R. Co. v. Pearson; Chicago & N. W. Ry. Co. v. Hansen*, 166 Ill. 623. Where there are facts justifying the inference of an implied invitation to cross in safety, the case is for the jury. *Langston v. Chicago & N. W. Ry. Co.*, 398 Ill. 248. The rule is established that a traveler on the highway has a right to rely upon open gates, where there is a knowledge of the custom of closing the gates for passing trains, as notice that no train is near and as an invitation to make a safe crossing. *Greenfield v. Term. R. Ass'n*, 289 Ill. App. 147. In *Humbert v. Lowden*, 385 Ill. 437, an upraised-gates case, the court said it was a settled rule in Illinois that a person is not at fault in failing to look and listen if misled without his

fault or if the surrounding circumstances excused the failure.

The question of the sign settled, we see no essential difference between the instant case and *Humbert v. Lowden*, 385 Ill. 437. In view of what was said in the *Humbert* case, we think the lack of knowledge by Marion Smith of the crossing-gate custom, the lack of warning that the gates were not in operation, the distraction of the locomotive headlights to the north, the lack of observable signals of the approaching train in the circumstances shown by the evidence, tended to prove a sufficient excuse for Smith's failure to look south again or stop so as to avoid collision with the ''City of New Orleans''. The question of the plaintiff's due care therefore was for the jury.

Defendant contends that there was no evidence tending to prove that it was guilty of negligence proximately contributing to plaintiff's injury. There is evidence that there were no flasher or other lights on the crossing; no visible warning that the the upraised gates were not in operation; no warning bell on the west side of the crossing; that the control bell on the east side sometimes worked and sometimes did not; no warning bell or whistle from the train; and of the location of the boxcars so as to obstruct the view to the south. We think this evidence, in the light of the speed of the ''City of New Orleans'', is ample to take the question of defendant's negligence to the jury. That the gates were upraised at the time under the authority of a Commerce Commission order does not absolve defendant from taking further measures requisite to making the crossing safe for the public. *Wagner v. Toledo P. & W. R.*, 352 Ill. 85, and *Karlock v. New York Cent. R. Co.*, 333 Ill. App. 655.

We think there is no merit to the contention that the verdict is against the manifest weight of

the evidence. On the question of the location of boxcars just south of Third Street at the time of the accident, six witnesses corroborated plaintiff; for defendant, six witnesses testified that the boxcars were not placed where plaintiff said they were. One of these, Clark, who appeared to be the first adult on the scene, based his testimony on what he saw as he turned his car around east of the crossing and as his headlights shone across the tracks. This was immediately after he had seen plaintiff and plaintiff's wife in their injured condition. Hanlon, a night police officer in Gilman, said the boxcars were south of the bridge. He admitted signing a statement in April 1948, which located the boxcars where plaintiff said they were. Two members of the crew of the "Bean Special" gave testimony that their engine and caboose had crossed Third Street going north on the second track from the west, switched over to the westernmost track and moved south on this track to one of the tracks leading from it to a cinder pit southwest of the crossing. They said there were no boxcars where plaintiff and his witnesses said there were and that their locomotive had not moved any boxcars. The men in the cab of the engine of the "City of New Orleans" saw no obstruction in their view of the Third Street crossing while they were approaching it. We cannot say that the jury should not have believed plaintiff and his witnesses on this question. There was testimony both of the movement of the "Bean Special" and testimony that such a movement was not noticed. There is testimony corroborating plaintiff's that his view to the south was obstructed by the boxcars when he was on the first track.

One of plaintiff's witnesses testified he heard the train's whistle and the crash simultaneously; another said, almost simultaneously. Hanlon heard a muffled whistle, the crew members of the "Bean Special"

heard the whistle and bell. The engineer on Number 2 is corroborated by the fireman and the brake supervisor, in his testimony that the whistle was blown almost continuously. The engineer said the electric bell began to ring at Champaign. The two men riding in the cab said it began to ring about a mile south of Gilman.

Plaintiff says that he drove across the crossing about eight miles an hour. Crewmen on the trains north of Third Street testified to opinions of the speed, based on watching the outline of the car in the glare of the locomotive headlights, ranging from 25 to 35 miles an hour. The men in the cab of the "City of New Orleans" gave as their opinion that plaintiff drove onto the first track at about 20 or 25 miles an hour and then picked up speed. We think this question was singularly one for the jury and we cannot say the jury should not have believed the testimony for plaintiff.

On the question of the sign, two of plaintiff's witnesses who drove east across the Third Street crossing about 7:30 P. M. the night of the accident saw the sign, though the night was dark. They were, however, familiar with the crossing. The tower man testified that he took off the shield when he left work. He said the sign could have been sooty. We see nothing in this testimony which would justify our upsetting the jury's verdict.

There was conflicting testimony on the question of whether plaintiff was familiar with the crossing by reason of having driven over it during the nighttime prior to the night of the accident. Plaintiff denied that he had ever done so. Defense testimony was that in a statement plaintiff said the gates at Third Street did not operate at night. To meet this there was testimony that the statement was taken two days after an amputation of plaintiff's leg and during

a day when plaintiff was being given drugs. The following question and answer were given in the statement: "Q. You, of course, are rational at the present time, A. Well, not altogether." Two witnesses for defendant testified that they had seen plaintiff driving an automobile on Third Street near the crossing during the evening on several occasions. This testimony was met by effective cross-examination and rebuttal testimony by plaintiff. Plaintiff had owned an automobile for approximately three months before the accident. For about two months before plaintiff married her in November 1946, his wife lived on Sixth Street, west of Douglas Street. After their marriage they lived in Danforth and Crescent City. He said he had driven over the crossing during the daytime, "mostly on Sunday mornings . . . approximately five or six times". His mother was then living north and west of the Third Street crossing and he visited her about three times a month. On the night of the accident he said he used the Sixth Street crossing in going to her house although she lived two blocks south of Sixth Street. He said he had passed Third Street on the way to look for his sisters. The credibility of these witnesses and the question of fact raised by the conflicting testimony were for the jury. The record discloses no reason for upsetting the jury's verdict in this respect.

Instruction No. 1 is peremptory. While it might give emphasis to the allegations in the complaint because of the abstracted statement of the answer, there is no fatal deficiency. Defendant says instruction No. 9 is too general in referring to defendant's duty of prudence in running its trains and does not limit the instruction to the evidence in the case. Defendant, however, in instruction No. 20 makes the same generality and does not limit the instruction to the evidence in the case. There is no merit in the objection to

instruction No. 10 which defines negligence. Instruction No. 12, in explaining the degree of proof, referred to "the question of fact which the plaintiff is required to prove". This should have read "any questions" or "the facts". The fault is cured by other instructions. Instruction No. 17 singles out plaintiff in telling the jury that they should not disregard his testimony because of his interest alone. Defendant's instruction No. 14 off-sets this objection. Instruction No. 19 is not prejudicially erroneous in failing to limit impeachment to material points. Instruction No. 25 does not over-emphasize the element of pain and suffering. It was necessary to single out that element in order to make the valid explanation of the method of its proof. Instruction No. 26 uses the term "present value" in discussing the measure of damages. *Hayes v. New York Cent. R. Co.*, 328 Ill. App. 631, was reversed on other grounds but criticized the use of the term where there was no rule by which the jury could compute present value. The last sentence in the instruction in *Ritson v. New York, C. & St. L. Ry. Co.*, 336 Ill. App. 356, did not limit considerable factors of damages to the evidence in the case. Neither instruction No. 26 nor any other instruction explained the term "present value". An explanation was given by a witness for plaintiff. Defendant argues here that the explanation was wrong but no witness for defendant gave any other explanation. We cannot say that the giving of this instruction was reversible error.

 Defendant's refused instruction No. 1 is peremptory. It suggests that plaintiff had an obligation to look or listen before entering upon the northbound track. Refused instruction No. 2 is not clear and is erroneous in stating what an engineer is entitled to assume. *Illinois C. R. Co. v. Slater,* 139 Ill. 190. Defendant's instruction No. 5 was properly refused. Refused instruction No. 7 stated that a person about to

609

cross railroad tracks was bound to reasonably use his sight and hearing to discover and guard against danger. This is not the law. There is no absolute duty requiring the use of faculties to discover and guard against danger. *Humbert v. Lowden,* 385 Ill. 437. Refused instruction No. 3 is clearly erroneous in telling the jury to give greater weight to positive than negative testimony on the question of the train whistle. The first part of refused instruction No. 4 was disapproved in *Minnis v. Friend,* 360 Ill. 338. Refused instruction No. 6 is not proper in this case in view of the upraised gates, etc. In *Robertson v. New York Cent. R. Co.,* 388 Ill. 580, the court used language contained in this instruction but there the plaintiff was guilty of contributory negligence and the question was of the railroad company's wanton and wilful conduct. Refused instruction No. 8 is substantially covered in instruction No. 27.

The last contention made by defendant is that improper argument by plaintiff's attorney prejudiced the jury so as to result in an excessive verdict. Plaintiff was 24 years of age and in good health at the time of the accident. His work had been mostly manual. In the accident his right leg was torn off at about the knee and the left leg was fractured in several places. A surgical amputation of the right leg was made about mid-thigh. Within ten days thereafter the left leg was amputated at about the same place as the right leg had been. Plaintiff suffered a comminuted fracture of the breast bone and the normal curvature of the spine was straightened by the accident. At the time of trial there was a muscle spasm of the lower back and the stump of the left leg was spastic. Plaintiff suffers pain "where the legs were"; his back hurts him a couple of hours every morning; his arms get stiff; his appetite is poor and there are days when he can keep nothing on his stomach; and he suffers nightmares from the memory

of the collision. He moves about the house by ''scooting'' on his hands and stumps and in the wheel chair. He requires attention when he goes out and in his private, personal, natural needs. At the time of the trial he was 30 pounds less in weight than at the time of the accident. His yearly salary at the time of the accident was approximately $2860. Defendant concedes that modern standard mortality tables indicate a life expectancy of about 45 years for a man 24 years of age.

Defendant refers to *Bartlebaugh v. Pennsylvania R. Co.*, 82 N. E. (2d) (Ohio) 853, for the proper type of proof in this kind of case. There plaintiff lost both legs above the knee. The Supreme Court of Ohio reduced the jury's verdict of $225,000 to $150,000, allowing $57,617 for present value of loss of wages and $92,283 for other damages. Defendant states that the *Bartlebaugh* case is distinguishable here because Bartlebaugh would require further surgery to be fitted with artificial limbs and Illinois courts have never recognized such a ''fantastic'' sum for pain and suffering.

This Court approved a $100,000 judgment in *Schneiderman v. Interstate Transit Lines, Inc.*, 326 Ill. App. 1, in 1945. The Court said, ''The damages awarded are unusually large, but the injuries sustained are exceptionally severe.'' In *Avance v. Thompson*, 320 Ill. App. 406, a verdict of $125,000 was reduced to $100,000 and judgment for that amount was entered. The Fourth District Appellate Court approved the judgment. Avance was 22 years old and his occupation as a brakeman gave him a yearly salary of $2400. The opinion of the Appellate Court was filed in 1943. Avance lost one leg a few inches above the knee and the other a few inches below the knee. At the time of the trial he used a wheel chair but needed assistance in getting in and out of it. The Court spoke of the difficulty of an Appellate Court in computing

mathematically the exact amount allowable to an injured person and said it was beyond such a court's province. It said that appraising scientifically human pain and suffering and a mutilated body was difficult.

■■ The question of damages to be assessed in this kind of a case is one of fact for the jury. The only guides to the jury were the instructions on the elements to be considered in awarding the damages and a witness for plaintiff who testified to a meaning of the term "present value" as applied to loss of future earnings. Defendant criticizes that testimony here but at the trial offered no contrary proof. It criticizes plaintiff's instructions on damages but itself offered none. There is nothing in the record which would justify a conclusion that the jury's finding of damages was against the manifest weight of the evidence.

■■ We are asked to find that the assessment was excessive. We need not cite authority for the statement that we must consider the fact that this verdict reflects an inflationary period in our economy. The question of excessiveness is not to be determined by what we as judges think the damages should have been. The question is whether reasonable men might differ in their answers to the question. We cannot say that reasonable men would not differ on the question whether $185,000 was too great an amount to allow plaintiff who was so badly injured, in consideration of his wages at the time of the accident and his probable earnings during his expectancy; of the pain and suffering he has undergone and will undergo; of the deprivation of the privileges and enjoyments common to men in like circumstances (*Howard v. Baltimore & O. C. T. R. Co.,* 327 Ill. App. 83); and his medical expenses and the probable expenses of attending him in the future. Because we think reasonable men might differ on this question, we cannot say that the jury was moved by

passion. Consequently we find argument of plaintiff's counsel was not prejudicial.

For the reasons given the judgment is affirmed.

*Judgment affirmed.*

BURKE, P. J. and LEWE, J., concur.