Ella Overman, Administrator of the Estate of Lester Overman, Deceased, Plaintiff-Appellee, v. Illinois Central Railroad Company, a Corporation, and John J. Brennan, Defendants. (Illinois Central Railroad Company, a Corporation, Appellant.)

Gen. No. 11,540.

Second District, Second Division.

February 20, 1962.

Eva L. Minor, of Kankakee, and Herbert J. Deany, of Chicago, for appellant.

Thomas L. Clinton, and B. R. Tongren, of Peotone, for appellee.

CROW, J.

This action was brought by Ella Overman, administrator of the estate of Lester Overman, deceased, plaintiff-appellee, on a Complaint consisting of two counts against the Illinois Central Railroad Co., defendant-appellant, and John J. Brennan, defendant, an engi-

neer employee at the time of the occurrence of the defendant, for the alleged wrongful death of Lester Overman, deceased. The defendant John J. Brennan was later dismissed as a party defendant. The decedent, Lester Overman, had died as a result of a collision between a pickup truck driven by him and a passenger train of the defendant railroad company at a public crossing one mile south of Peotone, in Will County. A jury trial resulted in a verdict for the plaintiff of $15,000. Count II of the Complaint, charging wilful and wanton misconduct, was dismissed on motion of the plaintiff, and paragraphs 7 and 8 of Count I of the Complaint were stricken on motion of the defendant, consented to by the plaintiff, which paragraphs had alleged that the defendant ran its train at a reckless and dangerous speed at a place where special care should have been taken, that it failed to give reasonable notice of the approach of the train, and that the defendant was negligent by reason of the fact that it did not have adequate signal protection to warn the decedent of the approach of the train. Motions were made by the defendant at the close of the plaintiff's evidence and at the close of all the evidence for a directed verdict, the first of which motions was denied and a ruling was reserved on the second motion. A judgment for the plaintiff was entered on the verdict, from which this appeal is taken by the defendant railroad company after the denial of its post trial motion for judgment notwithstanding the verdict or for a new trial. .

In the Complaint the plaintiff had alleged, inter alia, that she had been appointed administrator of the estate of Lester Overman, deceased, and that she brought suit as such administrator. The defendant denied this allegation. No proof of the appointment was made on the trial. After the defendant's post trial motion was made, the plaintiff moved for leave to file an amendment to the Complaint which included

a paragraph realleging the appointment of the plaintiff as such administrator and making profert of her letters. This amendment was allowed to be made over objection by the defendant.

When the case went to the jury the only charge of negligence against the defendant remaining in the Complaint was that the defendant was negligent by reason of the fact that it permitted a tall, long series of brush to grow up along the right of way of the railroad on railroad property to such an extent that the view from the crossing was blocked so that persons could not adequately see the approach of trains from north of the crossing when such persons were approaching the crossing in a westerly direction from the east, as was the decedent. This allegation was denied by the defendant.

The defendant's theory is that the plaintiff failed to prove the material averment of due care on the part of the decedent and that the decedent was guilty of contributory negligence as a matter of law; the trial court should have directed a verdict in favor of the defendant; there was error in instructing the jury; the plaintiff failed to prove the material allegations of her appointment as administrator; and the court erred in permitting the filing of the amendment to the complaint.

The plaintiff's theory is that the decedent was killed due to the negligence of the defendant in allowing bushes to grow along the right of way so as to obstruct the view of a person crossing the right of way; the evidence as to the negligence of the defendant and the exercise of due care by the decedent is sufficient to present a question on the issues to the jury; proof of her appointment as administrator was not required, and the Court rightly exercised its discretion in permitting the plaintiff's amendment.

The collision occurred on December 6, 1955, at about 11:15 a. m., at a point where a gravel township road,

extending east-west, crosses the main line of the defendant railroad, extending north-south, about one mile south of Peotone. The area is open country. At that point the railroad company has three tracks running in a north and south direction, numbered 1, 2 and 3, from west to east. The train was on track number 1, the farthest west track, and the train was going south. The tracks are straight and level. The track roadbed is elevated about 4½ feet above the adjoining flat right of way and there is a sloped embankment from the roadbed down to the adjoining right of way. The gravel township road crosses the tracks from east to west. Highway No. 54, running north and south, parallels the railroad right of way south of Peotone and east of the railroad company's right of way. The west edge of Highway 54 is about 95 to 100 feet east of the east rail of the east track at the crossing. The day was cold and clear, visibility was good, and the crossroad was dry.

The witnesses for the plaintiff were the plaintiff herself, Charles Barber, the fireman for the Illinois Central Railroad Company on the train at the time of the occurrence, LaVern Jacobs, Clyde Meyer, Lee Russell, Milan W. Schroeder, and Lloyd Weller.

Schroeder testified that he had sold the decedent Overman the pickup truck that was then being driven by Overman; it was a 1953 Dodge; the eyes of the driver would be 5 to 6 feet from the ground while sitting in the truck; this truck when driven by the decedent at 4 to 5 miles per hour could be stopped by Overman in 35 to 40 feet. The witness said he himself could stop it at that speed within 10 to 15 feet, but Overman's reaction time would be longer, he being older. The brakes were in good condition.

Russell testified that he was a photographer and took several pictures for the plaintiff within a week after the accident. Those photographs are in evidence as plaintiff's exhibits.

Meyer testified that he was a farmer living 1½ miles west of this railroad crossing and that he crossed the tracks travelling east from his home just a few minutes before the accident. After crossing the tracks and reaching Highway 54 he turned south. He did not see this collision. He had observed the pickup truck of Lester Overman coming from the north on Highway 54 at that time and it was about a quarter of a mile from, or north of, the intersection; Meyer was about 15 or 20 rods south of the intersection when the train passed him; he did not hear the bell or horn of the train; the bell and horn might have been sounded and he didn't hear them; he saw this train at the north edge of Peotone, a mile north of this crossing, when he was on the tracks looking north; he saw some bushes north of the crossing, starting about 400 feet north of the crossing, the bushes being about 5 or 6 feet high, and continuing northwardly about 200 feet. From a point 400 feet north of the crossing down south to the crossing there is no obstruction to the view looking to the north; the bushes are 5 or 6 feet above the roadbed of the railroad; the height of the roadbed from the right of way is 4½ feet and the bushes were 5 or 6 feet from the roadbed where the tracks were. Lester Overman, the decedent, had lived in the vicinity for a number of years, and was familiar with this crossing. The front end of the train was about 225 feet from the crossing when it stopped.

Jacobs testified that he lives three-quarters of a mile from this crossing on the south side of the road; he crossed there 3 or 4 times a week; he had observed the shrubbery or bushes growing along the tracks approximately 300 feet north of the crossing and extending another 200 feet northwardly; they are about 6 feet above the roadbed; looking north from the east side of the crossing these bushes do not at any point obstruct the view of a train on the west track

coming from the north; a person could see to Peotone, a mile north of the crossing, from a point 6 feet from the east track; the bushes do obstruct the view or opening of the St. Paul viaduct (a half mile north of the crossing); the view would be obstructed from where the bushes start for about 200 feet north.

Weller testified that he was familiar with this crossing; he had observed the bushes, viewing them in December, 1955, vaguely; they commence 175 to 200 feet north of the crossing, though he did not measure, and extend 4 to 5 feet above the tracks; he said they protruded up about 13 feet (meaning, presumably, from the foot or base of the embankment); at 50 feet and at 20 feet east of the east track looking north he said the bushes would obstruct the view of a train approaching from the north on track number 1, the west track, though he did not know how high a train would be.

Ella Overman, the plaintiff, testified that she was the widow of Lester Overman, he was a farmer, owned his own farm, was 64 years of age, in good health, she and two adult self-supporting sons survive, and she stated his net income in the past two years.

Charles Barber, the fireman of the train, was called by the plaintiff as her witness, and testified that he was working that day as a fireman on the Daylight Special running south from Chicago to St. Louis. He was 43 years old and had worked for the Illinois Central Railroad Company since 1943 as a fireman and engineer. He observed the decedent's pickup truck going south on Highway 54, parallel to the railroad right of way, when the train came out from under the St. Paul viaduct south of Peotone about one-half mile north of the crossing where the collision occurred. It is approximately 100 feet from the edge of Highway 54 to the east track of the railroad and as the driver

37

of the truck turned to go west at the crossing the fireman called the engineer's attention to it. The speed of the truck was then about 4 miles per hour and Barber figured it would stop at any instant. The train was travelling about 75 miles per hour and when it was about 1700 to 2000 feet from the crossing the horn on the diesel was blown, a regular crossing signal, two long, a short, and a long blast, then some short blasts, and a long blast, the bell was ringing, and the oscillating white headlight was operating. He could see in the cab of the truck, but could not distinguish whether the driver was a man, woman or child. He could not tell whether the driver was looking at the train or not. As the train approached the crossing the engineer applied the brakes and when it appeared the truck was not going to stop he put the train in complete emergency. The train and truck arrived at the crossing at the same instant. The train hit the truck and carried it on the front of the diesel until it stopped about $\frac{7}{10}$ths of a mile south of the crossing. Lester Overman was alone in the truck and was dead when help arrived. Barber, the fireman, had a clear view of the person in the truck at all times, from the time the train came out from under the viaduct south of Peotone and the deceased's truck turned to go west across the crossing until the truck disappeared from view in front of the train. There was no obstruction to Barber's view. The decedent had to cross two tracks before arriving at the track on which the train was approaching, track no. 1, the farthest west. The train consisted of two diesel units and eight cars. Its usual speed at that point was 79 m.p.h. It was on time. The diesel engine extends up about 16 feet from the ground.

The plaintiff's photograph, exhibit 1, taken from 60 feet east of the east rail of the east track on the south side of the crossroad, indicates a stretch of bushes apparently starting at about the base of the

38

east embankment east of the east tracks leading up to the flat roadbed where the tracks are. The track roadbed is elevated several feet above the adjoining east part of the right of way, the bushes being apparently several feet tall, and extending some feet south to north along that east embankment, a considerable extent of the tracks being visible north of the northern terminus of the bushes up to the St. Paul viaduct, one-half mile north of the crossing, and some beyond there, and a number of feet of the tracks being visible south of the southern terminus of the bushes. Her photograph, exhibit 2, taken from 20 feet (or 40 feet) east of the east rail of the east track on the south side of the crossroad, indicates a considerable extent of the tracks visible south of the southern terminus of the bushes down to the east-west township road, the south end of the bushes, the St. Paul viaduct, and some hiding of the tracks by the bushes for a ways south of that viaduct. It also indicates a wide flat part of the right of way extending east of the east embankment over to Highway 54, and indicates Highway 54 parallel to and east of the right of way. Her photograph, exhibit 3, taken from 50 feet east of the east rail of the east track on the north side of the crossroad, indicates a considerable amount of the tracks visible south of the stretch of bushes, then the stretch of bushes, and then a considerable amount of the tracks visible north of the bushes to the St. Paul viaduct, and some beyond there. Her photograph, exhibit 4, taken from 22 feet east of the east rail of the east track on the center (or south side) of the crossroad, indicates a more considerable part of the tracks visible south of the southern terminus of the bushes down to the crossroad, the southern end of the bushes, and the St. Paul viaduct. Her photograph, exhibit 5, taken from 90 feet east of the east rail of the east track on the center of the crossroad at the west edge of Highway 54, indicates the approach from the

east on the east-west township road, up a slight grade, to the tracks. It shows a cross arm sign containing the legend "Railroad Crossing–3 tracks" east of the tracks and north of the road.

The defendant's witnesses were: Charles Barber, the fireman, W. W. Elly, and T. Stewart Tribe.

Tribe testified that he was a State Trooper; was familiar with the crossing; had made certain measurements at the crossing with respect to the bushes; he was at the scene shortly after this collision; the bushes started 270 feet north of the crossing and they continued for 270 feet; they were about 6 feet above the east track; they did not at any time obstruct the view of the whole train; at all times after a car turned west until it reached the crossing a person could see that part of the train above the lower window sills of the cars; after passing the bushes nothing obstructs the view north for a half mile; at 95 feet east of the crossing looking north he could see at all times the part of a train above the lower window sills up the track for 1200 to 1400 feet; the closer he got to the tracks the better he could see; he said that at 4 m.p.h. the decedent's truck could be stopped in 10 feet; he was present when certain photographs in evidence as defendant's exhibits were taken.

Elly testified that he was a Claim Agent for the Illinois Central Railroad Company; he took various pictures which are in evidence as defendant's exhibits; the cross buck sign at the crossing is about 8 feet from the east track; at 95 feet east of the east track there is no complete obstruction to view to the north; one can see all of a train most of the time and part of a train all the time; from the east rail of the east track to the east rail of the west track is 50 feet; from the west edge of Highway 54 to the east rail of the east track is 95 to 100 feet; the engineer on the train that

40

day was John J. Brennan who had been retired several months ago, and Brennan was unable to come to the trial on account of his health.

The defendant's photograph, exhibit 1, taken from a point apparently about 6 feet east of the east track at the crossing, indicates all the tracks visible to the north to the St. Paul viaduct, shows the south end of the stretch of bushes, a considerable number of feet of all the tracks visible south of the bushes, the embankment up to the track roadbed, the flat wide right of way east of that, and Highway 54 east of that. It shows a train plainly visible headed south on the west track 425 feet north of the crossing. The defendant's photograph, exhibit 2, taken from 60 feet east of the east track at the crossing shows a train visible headed south on the west track 850 feet north of the crossing, the south end of the bushes, the St. Paul viaduct, and the region east to Highway 54. The defendant's photograph, exhibit 3, from the same point as its exhibit 2, shows the headlight of a train visible headed south on the west track 1300 to 1400 feet north of the crossing, the south end of the bushes, the viaduct, and the region to the east. There were two other defendant's photographs which we do not believe add anything to what is already otherwise depicted. All of the defendant's photographs were admitted in evidence without objection.

 A motion for a directed verdict should be allowed if, when all the evidence is considered, with all reasonable inferences and intendments therefrom in its aspects most favorable to the party against whom the motion is directed,—here, the plaintiff,— there is a total failure to prove one or more essential elements of the case,—here, the element of due care by the decedent. The same rule is applicable in passing upon a motion for judgment notwithstanding the

verdict. 'Railroad crossings are dangerous places, and in crossing them a person must approach the track with a degree of care proportionate or commensurate to the known danger. Where a train and a person travelling on a highway approach a railroad crossing at the same time, it is not the duty of the railroad to stop its train, but is, instead, the duty of the traveler, in obedience to the known custom of the country, to stop, if the circumstances require, and not attempt to pass in front of the advancing train. A traveler must make diligent use of his senses of sight and hearing, retain proper control of his vehicle, and exercise care commensurate with the danger to be anticipated. One who has an unobstructed view of an approaching train is not justified in closing his eyes or failing to look. A plaintiff cannot be permitted to say he looked and did not see an approaching train, when the view is not obstructed and had he looked he would have seen it. There may, however, be facts and circumstances such as obstructions to view or distractions that might mislead a plaintiff, without his fault, or excuse a failure to look and listen. But if the view of a crossing is obscured, and the location of the crossing is known to the traveler, it is the traveler's duty to approach the crossing with the amount of care commensurate with the situation as it exists,—his duty is enhanced rather than excused by such circumstances. The claim that care and caution by any person has been exercised cannot be sustained when the known facts disclose that ordinary care would have avoided the accident. There must be some evidence tending to prove due care by the decedent. The burden is on the plaintiff. Due care cannot be presumed from the mere fact of the happening of an accident and a consideration of the human instinct of self-preservation. Liability cannot rest upon imagination, speculation, or conjecture, nor upon a

42

choice between two views, equally compatible with the evidence, but must be based upon facts established by evidence fairly tending to prove them. If the record is without evidence of due care by the decedent, the decedent was necessarily guilty of contributory negligence as a matter of law and the Court should instruct the jury to render a verdict for the defendant: Tucker v. New York, C. & St. L. R. Co. (1958) 12 Ill2d 532, 147 NE2d 347; Carrell v. New York Cent. R. Co. (1943) 384 Ill 599, 52 NE2d 201; Greenwald v. Baltimore & O. R. Co. (1928) 332 Ill 627, 164 NE 142; Moudy v. New York, C. & St. L. R. Co. (1944) 385 Ill 446, 53 NE2d 406; Robertson v. New York Cent. R. Co. (1943) 321 Ill App 313, 53 NE2d 144, revd (1944) 388 Ill 580, 58 NE2d 527; Devore v. Toledo, P. & W. Railroad (1961) 30 Ill App2d 409, 174 NE2d 883; Burns v. Chicago & A. R. Co. (1921) 223 Ill App 439; Swenson v. Chicago, M., St. P. & P. R. Co. (1949) 336 Ill App 287, 83 NE2d 375; Wuerz v. Southern Ry. Co. (1943) 318 Ill App 1, 47 NE2d 513; Elliott v. Elgin, J. & E. Ry. Co. (1945) 325 Ill App 161, 59 NE2d 486; Sunnes v. Illinois Cent. R. Co. (1916) 201 Ill App 378.

Considering all the evidence, with all reasonable inferences and intendments therefrom, in its aspects most favorable to the plaintiff, there was a total failure to prove an essential element of the case, namely, the element of due care by the decedent. This railroad crossing was a dangerous place. In crossing it the decedent did not approach the tracks with a degree of care proportionate or commensurate to the known danger. The train and the decedent approached the crossing at the same time. It was not the duty of the railroad to stop its train. It was the duty of the decedent to stop if the circumstances required. He did not stop. He did not make diligent use of his senses of sight and hearing or exercise care

43

commensurate with the danger to be anticipated. There is no evidence he looked to the north for approaching trains. There is no evidence he listened for approaching trains. The decedent, approaching from the east, had an unquestionably unobstructed view of this train approaching from the north on the farthest west track and of all the tracks and the area to the north of the crossing at least to the St. Paul viaduct, about one-half mile north, if not to Peotone, one mile north, from a point on the crossroad approach to the crossing at least 6 feet east of the east rail of the east track, or at least 56 feet east of the farthest west track on which this train was approaching. At the speed he was travelling,—4 m.p.h.,—and with his brakes in good condition, the decedent, in good health, 64 years old, had the then present ability to stop within certainly not to exceed 40 feet, if not less,—well within that 56 foot area. Having such an unquestionably unobstructed view the decedent was not justified in failing to look. Had he looked only at that point of unquestionably unobstructed view, and not looked at all prior to then, he would have seen the approaching train and would have been in a position to stop before the accident. Instead, he traveled a minimum of 56 feet from that point, across two separate sets of intervening tracks and the spaces between, at 4 m.p.h., until colliding with this train on the farthest west track 56 feet beyond the point of his unquestionably unobstructed view. Under these circumstances, the stretch of bushes east of the east track on the east embankment starting about 270 feet north of the crossing and extending northwardly about 270 feet and being about 6 feet high above the track roadbed was not such an obstruction to view as to excuse the decedent from his apparent failure to look and listen for this approaching train from

44

the north on the farthest west tracks and did not convert otherwise negligent conduct into reasonable prudence so that it could be contended the plaintiff had offered evidence of due care. The location of the crossing was known to the decedent and if at some prior point and at some prior particular angle on the crossroad between Highway 54 and the tracks the decedent's view of a train approaching the crossing from the north on the farthest west track was obscured or partially obscured by that stretch of bushes it was the decedent's duty to approach the crossing with the amount of care commensurate with the situation as it existed,—his duty was enhanced rather than excused by such circumstances, if they existed. The known facts, in their aspects most favorable to the plaintiff, disclose that ordinary care by the decedent would have avoided this accident. There is no evidence tending to prove due care. The plaintiff has not satisfied the burden which rested on her. The decedent was necessarily guilty of contributory negligence as a matter of law.

Representative of the cases referred to by the plaintiff are: Bales v. Pennsylvania R. Co. (1952) 347 Ill App 466, 107 NE2d 179; Hughes Adm. v. Wabash R. Co. (1950) 342 Ill App 159, 95 NE2d 735; Randolph Adm. v. New York Cent. R. Co. (1948) 334 Ill App 268, 79 NE2d 301; Karlock Adm. v. New York Cent. R. Co. (1948) 333 Ill App 655, 78 NE2d 122 (abst.); Shaw Adm. v. Chicago & E. I. R. Co. (1947) 332 Ill App 285, 75 NE2d 51; Hatcher Adm. v. New York Cent. R. Co. (1959) 17 Ill2d 587, 162 NE2d 362; Humbert Adm. v. Lowden et al. (1944) 385 Ill 437, 53 NE 2d 418. We are not unmindful thereof and they do not militate against the principles we apply here. As the Bales case suggests, putting it quite briefly,— if the plaintiff's or decedent's view of the train prior

to the collision was unobstructed the defendant is entitled to a directed verdict,—if it was not then it is a question of fact for the trier of the facts to decide.

The other points raised by the defendant need not be discussed, under the circumstances. The Trial Court should have directed a verdict in favor of the defendant railroad company, or allowed the post trial motion for judgment notwithstanding the verdict.

The judgment is, therefore, reversed.

Reversed.

SPIVEY, P. J. and WRIGHT, J., concur.