(No. 27295.—

ELMER J. HUMBERT, Admr., Appellant, *vs.* FRANK O. LOWDEN *et al.*, Trustees of Chicago, Rock Island and Pacific Railway Company *et al.*, Appellees.

*Opinion filed January 18, 1944—Rehearing denied March 16, 1944.*

Joseph L. Shaw, and Ogden H. Chamberlain, both of Geneseo, for appellant.

Milton V. Thompson, Eaton Adams, both of Chicago, Henry Waterman, of Geneseo, and Carl A. Melin, of Cambridge, for appellees.

Mr. Chief Justice Smith delivered the opinion of the court:

This suit was brought in the circuit court of Henry county by Elmer J. Humbert, as administrator of the estate of John Elmer Humbert, deceased. The purpose of the

suit was the recovery of damages from appellees, as trustees of Chicago, Rock Island and Pacific Railway Company, resulting from the death of said deceased. The jury returned a verdict in favor of the administrator. On appeal the Appellate Court for the Second District found that the deceased was guilty of contributory negligence, as a matter of law. That court reversed the judgment of the trial court without remanding the cause. (317 Ill. App. 538.) The case is here on leave to appeal, granted by this court.

Inasmuch as the decision of the Appellate Court was based solely on its conclusion that, under the evidence, deceased was guilty of contributory negligence, as a matter of law, no other question is here involved. The facts necessary to a decision of the issue here presented may be stated as follows:

The accident occurred on a crossing in the city of Geneseo. At that point the railroad tracks cross State street at grade. The tracks extend in a northwesterly and southeasterly direction. State street runs north and south. The angle formed by the railroad east of the crossing and the street south of the crossing is, approximately, a seventy-five degree angle. The street is approximately sixty feet in width. The railroad right of way is one hundred feet in width. The train was running in a northwesterly direction on the westbound track. Four tracks extend across the street on this intersection. The westbound track on which the train was running is the second track from the south. On the east side of State street and at a distance of 33.1 feet south of the center of the westbound track is located a one-story building which was used as a police station. Immediately south of the police station is an alley extending east and west. This alley is ten or eleven feet in width. South of the alley the east side of the street is built up solid with various buildings to the end of the block, which is some two hundred feet south of the crossing.

The accident occurred at about three o'clock in the morning. The weather was clear. The crossing was well lighted. There was a stop light at the intersection of State street with a cross street, approximately two hundred feet south of the crossing. The deceased, accompanied by Owen Whitted, visited a restaurant on the east side of State street and approximately two blocks south of the crossing. They left the restaurant with one Daniels. Daniels got into his car which was parked at the east curb. The deceased and Whitted entered the deceased's car with Whitted under the wheel. The cars were parked at an angle. Daniels backed out from the curb and left first. He was headed north and passed over the crossing. Immediately after he had left the curb the deceased and Whitted followed, in the same direction. At the time Daniels crossed the tracks on the crossing he observed the car in which deceased was riding, behind him. At that time it was at, or near, the stop light on State street, two hundred feet south of the crossing. Daniels testified that as he drove over the crossing he observed flashes from the headlight of the train approaching from the southeast, on the windows of his car. He estimated that the train at that time was some 1200 feet southeast of the crossing. The record shows that the track east of the crossing was practically straight for a distance of some four miles. The engineer in charge of the locomotive pulling the train estimated that he was running at a speed of seventy or more miles per hour at the time he passed over the crossing.

When the autmobile in which deceased was riding was crossing the westbound track, it was struck by the train and both occupants of the car were fatally injured. The train ran a distance of three quarters of a mile before it was brought to a stop. The automobile and the bodies of the occupants were still on the pilot when the train stopped. It was a fast passenger train from Chicago. It was running at its usual speed through the city of Geneseo and

over the crossing in question. In order to protect the crossing, gates and a bell had been installed and maintained for some years. The bell was located at the crossing-flagman's shanty. The shanty was located south of the railroad tracks, but on the right of way, and west of State street. The bell was operated by the crossing flagman, by hand. The gates were also operated by him by means of levers in the flagman's shanty. They consisted of ordinary crossing gates which could be raised and lowered to protect the crossing. At the time in question a red lantern was hanging on each of the gates. When the gates were lowered they would extend across the traffic lanes in the street with the red lanterns in front of approaching traffic.

As already observed, the distance from the center of the westbound track to the north side of the police station was approximately thirty-three feet. There was a conflict in the testimony as to what distance one approaching on State street from the south could see a train, approaching from the east, after his line of vision had cleared the north side of the police station. There was some testimony that a traveler on the street, approaching the crossing from the south, by looking through the ten-foot alley, south of the police station, could see a train approaching from the east at a greater distance from the crossing. It is undisputed that the view of one approaching from the south on State street was completely obstructed until he had reached a point where he could look through the narrow alley, south of the police station. It is also undisputed that, after passing this alley, the view would be obstructed by the police station until he had reached a point opposite the north side of that building. The witnesses disagreed as to the distance from the crossing a train could be seen, looking eastward along the north side of the police station.

There was positive testimony by a police officer who was in the police station, that at the time and immediately before the collision, the crossing gates were up and that

the crossing bell at the flagman's shanty was not ringing. This officer was the first at the scene of the accident after it occurred. He testified that in a conversation with the crossing flagman he asked him what was wrong, to which the flagman replied "I guess this is the pen for me." This was disputed by the crossing flagman. Another policeman who was present testified that he did not hear such conversation. According to the testimony of the flagman, the gates were lowered before the automobile entered the crossing. If his version be accepted, then the automobile must have crashed the gates after they were lowered. It was admitted by him that the gates were not injured and were in the same condition after the accident as they were before.

The negligence charged was carelessness in operating the train over the public crossing at a high, reckless and dangerous rate of speed, without ringing a bell or sounding a whistle, or giving other warning of the approach of the train, and in negligently and carelessly failing to lower the crossing gates to warn the deceased of the approach of the train. There was a conflict in the evidence as to whether the whistle was sounded, or the engine bell rung. The Appellate Court found that even though it be assumed that the crossing gates were not lowered the deceased was not in the exercise of ordinary care for his own safety, in going upon the crossing without observing the approaching train.

It is true that the record indicates that if deceased had looked in the direction from which the train was approaching, after the automobile had reached a point where his vision was not obstructed by the police station, he could and would have seen the approaching train. Under the particular facts in this case, this is not conclusive, as a matter of law, that he was guilty of contributory negligence. In determining whether the deceased was guilty of contributory negligence neither this court nor the Appellate Court can weigh the evidence. If there was any evi-

dence, standing alone, which tended to support the plaintiff's claim, it cannot be said, as a matter of law, that there was no evidence of due care on the part of the deceased. (*Blumb* v. *Getz,* 366 Ill. 273.) Where the effect of the Appellate Court's holding is that there is no evidence sufficient, when considered alone, to sustain the charges in the complaint, it becomes the duty of this court to examine the record to determine whether there is any evidence, which, taken with its intendments most favorable to the plaintiff, tends to prove the charges in the complaint. *Bartolucci* v. *Falleti,* 382 Ill. 168.

Here, for the protection of the public, appellees had erected and maintained crossing gates. If the gates were not lowered this amounted to an invitation to travelers on the highway. It was an assurance, to them, that they could cross over the railroad tracks in safety. In *Chicago and Alton Railroad Co.* v. *Pearson,* 184 Ill. 386, it was said: "It is not a rule of law that the omission of the duty to look and listen will bar a recovery where there are facts excusing the performance of that duty." This rule was quoted with approval in *Chicago and Eastern Illinois Railroad Co.* v. *Schmitz,* 211 Ill. 446. It was there said that it is a question for the jury to determine whether, in view of all the surroundings, the injured party was guilty of negligence, in failing to look and listen, or whether he is relieved, by the circumstances, from the duty to look and listen. In *Chicago and Alton Railroad Co.* v. *Pearson,* 184 Ill. 386, it was also said, that it is the settled rule of this court that it cannot be said, as a matter of law, that a person is in fault in failing to look and listen, if misled without his fault, or where the surroundings may excuse such failure. In support of this rule the court there cited *Chicago and Northwestern Railway Co.* v. *Hansen,* 166 Ill. 623; *Terre Haute and Indianapolis Railroad Co.* v. *Voelker,* 129 Ill. 540; *Chicago and Northwestern Railway Co.* v. *Dunleavy,* 129 Ill. 132, and *Pennsylvania Co.* v.

*Frana,* 112 Ill. 398. It is a question for the jury to say whether the failure to stop and look is,. or is not, negligence. *Chicago City Railway Co.* v. *Barker,* 209 Ill. 321.

Here the record shows that there was a conflict in the evidence as to whether the crossing gates were lowered and the crossing bell sounded. There is also a sharp conflict in the evidence as to the distance east of the crossing the approaching train could have been seen by a traveler on State street, after he had reached a point where his vision was unobstructed by the buildings on the east side of the street. In this connection we regard the fact that a civil engineer and others testified that they could see an approaching train, by looking through the ten-foot alley along the south side of the police station, some 900 to 1200 feet east of the crossing, as of little persuasive force. The means of observation of one standing at a point in State street where he could look east through the alley for the purpose of making a test, as to his ability to see an approaching train, are not comparable with the position of one traveling in a moving vehicle on the highway, should he attempt to look through this narrow space.

There is also the question in the case as to whether the operation of the train over a busy street intersection at a rate of speed in excess of seventy miles per hour was negligence on the part of appellees, and whether such speed would have a bearing on the question of the contributory negligence of a traveler on the highway who may have looked and misjudged the speed of the train. Notwithstanding there may have been no statute or ordinance limiting the speed of the train at that particular point, a railroad company, in running its trains, is always required to use ordinary care and prudence to guard against injury to persons who may be rightfully traveling upon the public highways. This is true whether there is a statutory regulation upon the subject or not. (*Chicago City Railway Co.*

v. *Fennimore,* 199 Ill. 9.) Whether the testimony tending to show that the gates were not lowered, or the crossing bell sounded, considering the admitted high rate of speed of the train, was sufficient to excuse the deceased from the duty to look, was, under the particular facts of this case, a question for the jury. (*Chicago and Alton Railway Co.* v. *Pearson,* 184 Ill. 386.) The deceased was not charged with knowledge that the train would be operated at a high and dangerous rate of speed, without the operation of the crossing gates, nor was he charged with knowledge that the crossing gates would not be operated. They were installed for that purpose. It was the duty of appellees to operate the crossing gates, or to otherwise protect the crossing. Anticipation of negligence on the part of others is not a duty which the law imposes upon travelers upon the highway. They have the right to presume that trains will be operated in a proper and skillful manner and that the crossing gates, installed for that purpose, will be operated, so as to prevent them from going on the crossing in front of an approaching train.

We cannot escape the conclusion that, under the particular facts shown by the evidence in this case, the question of whether the deceased was guilty of such contributory negligence as to bar a recovery, was a question of fact for the jury. The Appellate Court erred in holding that, as a matter of law, there was no evidence tending to prove that the deceased was in the exercise of due care and caution for his own safety.

The judgment of the Appellate Court for the Second District is reversed. The cause is remanded to that court with directions to consider the other errors assigned.

*Reversed and remanded, with directions.*