968

RICHARD HERGLUND, *et al.*, Plaintiff-Appellant, *v.* NEW YORK, CHICAGO, & ST. LOUIS, RAILROAD COMPANY, *et al.*, Defendant-Appellee.

(No. 55038;

First District—September 21, 1971.

Fitzpatrick & Gulbranson, of Chicago, (Peter Fitzpatrick and John W. Burgess, of counsel,) for appellant.

Winston, Strawn, Smith & Patterson, of Chicago, (Edward J. Wendrow and Stanley A. Walton, III, of counsel,) for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Richard Herglund (plaintiff) sued New York, Chicago and St. Louis Railroad Company, an Illinois corporation also known as Nickel Plate Railroad but now known as Norfolk and Western Railway Company (Railroad) for negligence. Plaintiff seeks damages individually for his personal injuries and also as administrator for alleged wrongful death of plaintiff's late wife, Glenda Sue Herglund. The cause involves a train and automobile collision at a grade crossing in Paxton, Illinois.

A jury trial was held after which verdicts were returned against plaintiff in both capacities. The jury also returned affirmative answers to three special interrogatories: "1. Was decedent, Glenda Sue Herglund, guilty of negligence which proximately contributed to cause the occurrence in question? 2. Were the plaintiff, Richard Herglund, and the decedent, Glenda Sue Herglund, engaged in a joint enterprise at the time of the occurrence? 3. Was plaintiff, Richard Herglund, guilty of negligence which proximately contributed to cause the occurrence in question?"

The trial court entered judgment on the verdict in favor of the Railroad, from which plaintiff appeals. A statement of the pertinent facts is essential.

Paxton, Illinois, a town of some 4000 people is located in Ford County. Railroad operates a main track traversing Paxton in an east-west direction. Going to the west, the main track and another closely parallel set of tracks cross, in order, Washington Street, Union Street, Vermillion Street, State Highway 45 and Market Street. The train in question, operated by Railroad personnel, was a freight train proceeding west on the main track which is to the south of the other tracks. Some 800 feet to the east, the main track curves to the north. The occurrence took place on May 22, 1963, at about 4:45 p.m. Daylight Savings Time, or 3:45 P.M. Railroad or Standard Time. The weather was sunny and clear.

The crossings at State Highway 45 and at Market Street are equipped with signal flashers to warn motorists. The crossing at Vermillion is protected only by wooden crossbuck signs which are north and south of the tracks. The southern crossbuck, which is visible by northbound motorists, is placed some 33 feet south of the main track and nine feet

east of the east side of the Vermillion pavement. At a point on Vermillion Street 200 feet south of the main track, the track is three feet over the grade of Vermillion. At a point 25 feet south of the main track, it is one and one-half feet over the grade of Vermillion. Otherwise expressed, the grade percentage from a point 25 feet south of Vermillion Street is six per cent. The train involved in this occurrence was made up of three diesel units, each some 15 feet high and 44 freight cars. The tracks add about five inches to the height of the locomotives. The train was operated by a crew of five Railroad personnel. An engineer controlled the train from the north side of the first diesel unit. A fireman was stationed on the south or left side of the first diesel. A brakeman was seated just behind the fireman. A conductor was stationed in the second diesel. There was a flagman in the caboose, some 2500 feet from the front of the train.

We will next attempt to describe the physical aspects of the crossing although that can be best shown by the photographs and a scale survey received in evidence. Vermillion Street is a 20 foot street with bituminous paving. Looking to the right, or to the east, there are a series of wooden bins and buildings, all owned by the Railroad. The first three of these are from 22 to 34 feet south of the main track and from 14 to 55 feet east of Vermillion. Going farther to the east, there is a one-story frame structure about 32 feet south of the track and some 62 feet east of Vermillion. Next in line is a one-story building about 26 feet south of the track and approximately 100 feet east of Vermillion. There are additional frame structures used by the Railroad located farther to the east. The next building is 26 feet south of the track and 128 feet east of the pavement. This is followed by a one-story building 25 feet south of the track and 175 feet east of the pavement. The last building is 25 feet south of the track and almost 200 feet east of the pavement. There are no trees north of any of these buildings.

Plaintiff testified that on the date of the occurrence his view to the east was restricted to 30 or 40 feet by the presence of two or three cars and two trucks which were parked between the Railroad buildings and the main track to the east of Vermillion. Plaintiff indicated the location of these vehicles on the scale survey. This shows two cars parked parallel to the main track north of the Railroad properties, next to the east a truck parked diagonally and further to the east another truck parked parallel to the tracks. Plaintiff testified that these vehicles were approximately ten feet south of the tracks. He described one truck as having a box-like structure. He described the other truck as having a flat bed with a rack on it. A photograph introduced in evidence by plaintiff shows two automobiles and two trucks parked between the tracks and the Railroad

property. These trucks agree with plaintiff's description. This photograph was taken on September 14, 1963, close to four months after the occurrence. There is evidence by a Railroad employee that this photograph portrays the cars parked in their customary manner.

However, there is testimony by four Railroad employees, including three members of the train crew, that no cars were parked in this area on the date in question. This is corroborated by Railroad employees who worked in the buildings in question. Their testimony is to the effect that only two employees ever parked their cars south of the tracks and that both of them had left work and removed their cars prior to the accident. There is also testimony from three members of the train crew and from a truck driver employed by the Railroad, that only one truck was parked in the area in question. This truck was described by Railroad employees as being approximately eight to nine feet in height.

As the crossing is approached from the south, looking to the left or west, there is a paved road running east and west parallel to the main track and approximately ten or 12 feet south thereof. This road runs east to a T-shaped intersection with Vermillion. There are three trees located south of the road and about 45 feet south of the main track. A wooden pole is situated approximately halfway between the road and the railroad tracks, some 65 feet west of Vermillion. There is a one-story frame house some 48 feet south of the track.

Plaintiff and his wife were both young people, then approximately 20 years old. Plaintiff was stationed at an Air Force Base some ten miles from Paxton. The deceased was employed in Paxton at a location south of the railroad track and slightly east of State Highway 45. Plaintiff drove from the Base to the decedent's place of employment. The automobile was jointly owned by plaintiff and decedent. At about 4:30 P.M. Daylight Time, she entered the automobile and they proceeded toward their home which was north of the railroad crossing. Plaintiff drove east to Vermillion Street then made a left turn and drove north on that street toward the crossing. Plaintiff testified that he had taken this route some two or three times a week for a period of two to three months before the fatal accident. Plaintiff had previously seen only one train at the crossing; in March or April of 1963. This train was going east and had crossed Vermillion Street when plaintiff was about a block south.

Plaintiff testified that when he was some half block south of the crossing, he drove at approximately 25 miles per hour. Plaintiff first looked to the right when he was 25 feet south of the crossing. This would place his automobile at that time some eight feet north of the crossbuck. When plaintiff looked right, he saw only the buildings above described, two trucks and two or three automobiles. At that point, he

could see from 30 to 40 feet down the tracks in an easterly direction. At that time, plaintiff had reduced his speed to some 15 miles per hour and he had his foot on the brake.

Plaintiff looked right for about one-half a second or so and then looked left. At that time, he was approximately 15 feet south of the main track. He testified that here he could see 50 to 75 feet down the track looking to the left or in a westerly direction. Plaintiff could see nothing on the track. He put his foot on the gas because of the grade. Plaintiff then looked to the right for the second time. At that time, the front end of his automobile was on the track and his speed was some five to ten miles per hour. Plaintiff testified that he did not hear anything at that time. The train struck the automobile instantly after plaintiff had looked to the right for the second time. Plaintiff was wearing sun glasses but they did not obstruct his vision. Plaintiff testified that his window was down at that time. He did not know if his wife's window was open or closed. The deceased was sitting in the front seat next to plaintiff. As a result of the impact, plaintiff's wife was instantly killed and plaintiff suffered personal injury.

Plaintiff testified that he did not hear a whistle or bell from the train. Furthermore, he testified that he did not hear the train. When plaintiff had previously seen a train at this crossing, he had heard the train from a distance of perhaps a block away. At the trial plaintiff testified that the car radio was not on. However, on his deposition, plaintiff had testified that the car radio was on and that he was listening to music, which was his usual practice. Also plaintiff and the deceased were engaged in conversation as they approached the track.

As regards to the blowing of the whistle and sounding of the engine bell, testimony was given by the fireman that the whistle and bell were sounded commencing when the train came to a point some 1500 feet east of the crossing of Washington Street. It will be recalled that this street is the second block to the east of Vermillion. He testified that the whistle and bell were also sounded for the crossings of Union Street and Vermillion. This testimony was corroborated by the head brakeman and by the conductor. The engineer was in the act of blowing the train whistle when the fireman directed him to make an emergency stop. In addition, some six citizens who lived in the area testified that they heard the train whistle or bell and heard the crash a few seconds later.

Also, a motorist approaching the crossing on Vermillion Street from the north saw the impact. He heard the noise of the approaching train for about five or six seconds before he saw plaintiff's car. He testified that plaintiff's car approached the tracks at about 20 miles per hour or probably quite a bit slower. This speed did not vary until the collision; which

occurred about three seconds after he first saw the car. The mother of this witness was a passenger in his car. She first heard the train coming when they were three-quarters of a block, or about 300 feet, north of the tracks. The impact was ten seconds later. In her estimation, plaintiff's car traveled about one-fourth of a block during that time.

The engineer testified that the authorized speed of the train through Paxton was 49 miles per hour. At the time, the train was traveling at a speed of about 45 miles per hour. The engineer was stationed on the north side of the train in the cab of the diesel unit. He did not see the automobile at any time before the impact. When alerted by the fireman, he made an immediate emergency stop. The train did not come to a stop until a point some 2000 feet west of Vermillion Street.

None of the remaining members of the train crew saw plaintiff's automobile prior to impact, except for the fireman. He was stationed on the left or south side of the locomotive. He testified that the train was moving approximately 45 miles per hour. When he first saw the automobile, the train was approximately 100 feet east of Vermillion Street and the automobile was then some 140 feet south of the main track. At that time, he could not estimate its speed. After his first glance at the car, his view was temporarily obstructed by one of the buildings south of the track. He next saw the car at the crossbuck sign. He estimated that its speed was then about 25 miles per hour. It did not slacken or vary this speed thereafter. He then called to the engineer for the emergency stop but the collision occurred within the second.

In seeking reversal, plaintiff contends:

1.  Erroneous instructions given by the trial judge effectively removed from consideration by the jury the issue as to whether the railroad crossing was extrahazardous.

2.  Plaintiff was deprived of a fair trial because the trial court erroneously received in evidence incompetent photographs offered by defendant.

3.  There was no evidence of joint enterprise between plaintiff and his wife. Therefore, the trial court erred in submitting the issue of joint enterprise to the jury by instructions and by a special interrogatory.

4.  The trial judge erroneously gave an excessive number of instructions repeating propositions of law regarding contributory negligence in connection with the separate claims of plaintiff individually and also as administrator.

5.  The trial court erred in refusing to submit to the jury the question of whether defendant was guilty of willful and wanton misconduct.

In each instance, Railroad takes a contrary view of these contentions. It argues strongly that the special finding of the jury that plaintiff was

guilty of contributory negligence rendered harmless all possible trial errors which did not tend to produce this result. Further, defendant urges that plaintiff was guilty of contributory negligence as a matter of law. We will consider these various contentions virtually in the order stated. As required, we will give separate consideration to plaintiff's causes of action as an individual and as administrator.

We will first consider the issue of contributory negligence of plaintiff. As shown, the jury found by answer to special interrogatory that plaintiff was guilty of negligence which proximately contributed to cause the occurrence. There is evidence by four employees of Railroad, and also by six unimpeached and apparently impartial eyewitnesses, that the whistle and bell were being sounded by the train crew long before the time of impact. The motorist and his mother, traveling south on Vermillion, both testified that they heard "a noise" from the train for some time before impact. As against this, plaintiff testified only that he did not hear the train. Yet plaintiff testified that on another occasion, in approaching his same crossing, he did hear the train when about a block away.

Plaintiff's testimony is weakened by impeachment. He testified that his front window was open and that his car radio was not turned on. However, on cross-examination, he admitted that his deposition testimony was that his car radio was in operation and he was listening to the music. He also admitted that at this time he was engaged in a conversation with his wife. Under these circumstances, it must be concluded that the answer given by the jury to this special interrogatory was correct by a great preponderance of the evidence based upon failure of plaintiff to use his sense of hearing. In a closely analogous case, *Pedrick v. Peoria & Eastern RR. Co.*, 37 Ill.2d 494, 511, the Supreme Court contrasted the dubious probative value of highly equivocal testimony with, "* * * the uinequivocal testimony by persons with no apparent interest in the outcome of this lawsuit and the corroborative testimony of the railroad employees * * *." The Supreme Court held that the evidence there, even viewed most favorably to plaintiff, so overwhelmingly favored defendant that no contrary verdict could ever stand. In the case at bar, we need not apply the same principle. It is not necessary for us to hold that the trial court should have directed a verdict at the close of all the evidence because of plaintiff's contributory negligence. We reach the patent conclusion that the finding of the jury in this regard is supported by a great preponderance of all the evidence.

■■ The above conclusion, based upon failure to heed the audible warnings of the approach of the train is further buttressed by unheeded visual evidence of danger. As regards plaintiff's view to the west, or his

left, it is clear from all the evidence that plaintiff's view was not obstructed. The absence of obstruction in this direction is not probative since the train came from the east and toward the west. However, plaintiff's testimony regarding the view to the west is important because, in our opinion, it was one of several decisive factors in impeaching plaintiff and in causing the jury to find him guilty of contributory negligence. Plaintiff testified that when he was about 15 feet from the tracks he looked to the left, which was west, and could see only about 75 feet. The evidence, including photographs introduced by plaintiff, shows that this testimony was incredible. There is an improved street running roughly parallel to the main track some ten or 12 feet to the south. Thus, when plaintiff was 15 feet south of the track he had virtually an unlimited view to the west. This necessarily caused the jury to lose faith in plaintiff's testimony.

As regards plaintiff's view to the east, or right, from which direction the train was arriving, plaintiff testified that he looked for the first time when he was 25 feet south of the crossing and was able to see only 30 or 40 feet down the track. This testimony was completely contradicted. Plaintiff based his inability to see for a longer distance upon the presence of two automobiles and two trucks parked north of the Railroad buildings. But, as shown above, the evidence given by Railroad employees established that there were no cars, and only one truck parked in the area southeast of the tracks. To add to the finality of this evidence, an additional factor is the height of a diesel unit of 15 feet, plus the five inch height of the tracks, plus the elevation of the tracks one and one-half feet above the grade of the street. These matters combined, all serve to destroy plaintiff's testimony regarding obstruction of his view.

Plaintiff testified that he was traveling at low speed. The alleged obstructions pointed out and depended upon by plaintiff in this case have no materiality because plaintiff testified that he did not look to the east until he was about 25 feet south of the main track. Plaintiff knew from his familiarity with the area that he was at a railroad crossing. He had seen a train at this very spot. He knew that he was approaching a place of grave danger. He had seen the warning crossbuck a number of times before. On this day, he had seen the crossbuck when he was a block south of the tracks. He knew that there was no protection at this crossing other than his own audio and visual powers. Yet, plaintiff chose to approach to a point 25 feet south of the main track before looking in either direction. Plaintiff's own testimony thus establishes that any obstruction of his view to the east from any point more than 25 feet south of the main track could not have been the proximate cause of his mishap. The evidence here hows that at a speed of 15 miles per hour plaintiff's car ad-

vanced 22 feet per second. Even considering plaintiff's testimony that he reduced his speed, it is evident that he allowed himself very little time indeed for the exercise of due care in examination on both sides of the crossing. Only the presence of a complete obstruction could arguably excuse plaintiff from his duty to look before approaching the tracks beyond the crossbuck.

The conclusion, therefore, is inevitable that plaintiff was guilty of contributory negligence and the special finding of the jury in this regard as well as the general verdict against plaintiff individually were both eminently proper and fully justified by the evidence.

■■ It remains to consider the effect upon this special verdict of the various trial errors alleged and depended upon by plaintiff. The first error regards the contention that the court removed from consideration by the jury the issue as to whether the crossing was extrahazardous. We need not consider or pass upon this alleged error. Since we approve the special verdict that plaintiff was guilty of contributory negligence, it follows necessarily that plaintiff's individual cause of action is barred regardless of whether the proof showed that Railroad was guilty of negligence. The law of this jurisdiction, although assailed as being harsh and even unjust, is clear and definite that the issue of contributory negligence is separate and distinct from the defendant's guilt of negligence and, "* * * it has been repeatedly held that notwithstanding the negligence of the defendant, if such is shown, contributory negligence bars recovery." *Prill v. City of Chicago,* 317 Ill.App. 202, 209. See also, *Carter v. Winter,* 32 Ill.2d 275, 284; *Siebens v. Konicek,* 108 Ill.App.2d 300, 303; *Jellen v. New York, Chicago & St. Louis RR. Co.,* 53 Ill.App.2d 44, 49.

■■ The next alleged trial error is directed against the ruling of the court in receiving in evidence certain of Railroad's exhibits despite objection aptly made that they were posed photographs taken long after the occurrence and did not accurately portray the circumstances which existed at the time in question. The purpose of the photographs; and, indeed, their only effect, was to demonstrate to the jury that the engine was larger and taller than an automobile. This is a fact of universal common knowledge. The photographs were cumulative at best. In addition, the comparative height of engine and car had no bearing or effect upon the finding of contributory negligence which, as above pointed out, rested upon failure of plaintiff to use his sense of hearing, impeachment of plaintiff and plaintiff's complete failure to look in either direction until he was 25 feet from a known danger.

■■ The third and next assignment of error pertains to the issue of joint enterprise. This issue has no bearing whatsoever upon plaintiff's guilt of contributory negligence.

The next and fourth alleged error is directed to repetition in the instructions by the court. Plaintiff points out that the court instructed the jury that it was the duty of plaintiff to use ordinary care and also that it was the duty of the decedent to use ordinary care. I.P.I. 10.03 as revised was thus repeated as to plaintiff and decedent. In addition, I.P.I. 11.01, defining contributory negligence, was similarly repeated. Separate instructions on burden of proof on the issues were given as to plaintiff and as to decedent and both of these instructions stated the burden of proof concerning use of ordinary care (I.P.I. 21.02).

■■ It is true that needless repetition in instructions should be avoided. In fact, one of the many benefits resulting from adoption of pattern instructions was elimination of repetition caused by homemade instructions created by both sides with only the benefit of their respective clients in view. This appears from the authorities cited by plaintiff which antedate I.P.I. (*Randal v. Deka*, 10 Ill.App.2d 10; *Baker v. Thompson*, 337 Ill.App. 327.) However, it seems to us that the trial court was properly anxious to avoid confusion which might well result if the diverse elements in the separate causes of action for injuries and wrongful death were commingled. (See *Freer v. Rowden*, 108 Ill.App.2d 335.) In addition, these repetitions were, in two cases, simply definitions. The only mandatory instruction was that regarding burden of proof. This instruction was mandatory against Railroad just as it was, in a sense, mandatory against plaintiff. In view of the strong character of the evidence of contributory negligence of plaintiff, we cannot see from this record that plaintiff was prejudice in any manner by this repetition in the instructions. Under these circumstances, with no showing of prejudice, it is our duty to affirm the judgment. *Sherman v. City of Springfield*, 111 Ill.App.2d 391, 410; *Christianson v. City of Chicago Heights*, 103 Ill.App.2d 315, 327; *Hedge v. Midwest Contractors Equipment Co.*, 53 Ill.App.2d 365, 386.

The last point raised by plaintiff pertains to refusal of the trial court to submit to the jury the issue of Railroad's guilt of willful and wanton misconduct. The second count of the amended complaint alleged that Railroad was guilty of willful and wanton misconduct in that it maintained an extrahazardous crossing without means of warning of approaching trains; operated the train at excessive speed; failed to sound a whistle or bell and failed to maintain a lookout for motorists. At the close of all the evidence, the trial court ruled that these issues would not be submitted to the jury for lack of evidence to support the second count of the amended complaint.

The words "willful and wanton" describe a legal concept which is simple of definition but often difficult of application. These words have been defined in so many learned legal opinions that further definition is

unnecessary. We need simply refer to *Klatt v. Commonwealth Edison Co.*, 33 Ill.8d 481, 488, which in turn sets forth the commonly accepted definition given to us in *Schneiderman v. Interstate Transit Lines Inc.*, 394 Ill. 569, 583.

The parties have cited some 30 cases bearing upon this question. To consider them all would expand this opinion to volume length. We have considered these authorities as well as all of the evidence in the voluminous record. Plaintiff cites and depends strongly upon *Maltby v. Chicago Great Western Ry. Co.*, 347 Ill.App. 441, where the court was unable to say that the trial court erred in permitting the case to go to the jury on the willful and wanton counts. The most recent decisions cited by defendant are *Trumbo v. Chicago, Burlington & Quincy RR. Co.*, 389 Ill. 213 and *Robertson v. New York Central RR. Co.*, 388 Ill. 580; both railroad crossing cases. In these cases, the Supreme Court reversed the Appellate Court and held that the evidence did not support the charge of willful and wanton conduct.

█ ██ In the case at bar, there is no evidence of excessive speed. The engineer testified that the authorized speed in Paxton was 49 miles per hour and the train was traveling at 45 miles per hour. If the crossing was extrahazardous so as to require some warning in addition to the wooden crossbuck, this would have shown negligence but would not have shown willful and wanton misconduct under plaintiff's evidence here as applied to any accepted legal definition of that phrase. The evidence as to sounding of a whistle or bell preponderates greatly in favor of defendant. As regards the issue of lookout, there is no evidence of willful failure by Railroad employees to maintain a proper lookout and no evidence that such lack of proper lookout was a proximate cause of the occurrence. In short, we find a complete failure of proof of any element of willful and wanton conduct. In our opinion, the trial court acted correctly in withdrawing the second count of the amended complaint from consideration by the jury.

It follows from the above analysis that the judgment against plaintiff in his individual action for personal injuries was correct and should be affirmed. It remains to consider the cause of action for wrongful death of the wife. The initial issue here is whether the cause of action for wrongful death would be barred because of the established contributory negligence of a beneficiary. In *Nudd v. Matsoukas*, 7 Ill.2d 608, the court cited decisions from other jurisdictions holding that the negligence of one of several beneficiaries is not a bar to a wrongful death action. The court further held that the negligence of a beneficiary who was also a defendant did not bar the action; but, rather, prevented his own right to recover for pecuniary loss. (7 Ill.2d 608 at 616. See also, *Kinsch v. Di Vito Con-*

*struction Co.*, 54 Ill.App.2d 149, 156-57.) In the case at bar, it appears from the abstract and supplemental abstract filed by plaintiff's counsel that plaintiff is the sole beneficiary of the cause of action for wrongful death.

The problem here is solved with finality by the statute which has been the law of Illinois since 1955 and which was applicable to this occurrence. (Ill. Rev. Stat. 1955, ch. 70, pars. 1, 2. See also Ill. Rev. Stat. 1961, ch. 70, par. 2.) The statute provides that it shall not be a defense that the wrongful death was caused in whole or in part by the contributory negligence of one or more of the beneficiaries on behalf of whom the action is brought. However, damages assessed are not to include compensation to any contributorily negligent beneficiary and such person "* * * shall not share in any amount recovered in such action." As noted above, plaintiff appears to be the only surviving next of kin of his deceased wife. Consequently, since the statute prevents him from participation in any recovery, it would be a completely futile and useless act for us to reverse the judgment against plaintiff as administrator and to direct a retrial of the wrongful death action, even assuming that the errors urged by plaintiff require reversal of the judgment on this claim.

■■ We note that sections 2(a), (b) and (c) of the applicable statute above cited, provide that where the deceased "* * * left no widow or next of kin entitled to recovery * * *" recovery may be had for hospital and medical services and for other costs and expenses. (Ill. Rev. Stat. 1961, ch. 70, par. 2.) However, this portion of the statute is limited to cases in which there is no next of kin surviving. *Chidester v. Cagwin*, 76 Ill.App.2d 477, 484.

■■ We accordingly hold that in a situation such as appears from this record, where the contributory negligence of the single and only beneficiary of the action for wrongful death has been legally and properly established, that such contributory negligence operates to bar prosecution of the cause of action.

■■ It follows necessarily that our determination for affirmance of the judgment in favor of Railroad and against plaintiff in his individual action requires affirmance of the judgment in favor of Railroad and against plaintiff as administrator. Hence, we need not consider claimed trial errors pertaining to the remaining special interrogatories or to the verdict in favor of Railroad and against plaintiff as administrator. Consequently the judgment on both verdicts in favor of Railroad is affirmed.

Judgment affirmed.

BURKE, P. J., and LYONS, J., concur.