ROBERT L. REISS, Plaintiff-Appellant, *v.* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Defendant-Appellee.

First District (2nd Division)   No. 77-832

Opinion filed September 25, 1979.

Philip H. Corboy & Associates, P.C., of Chicago (Philip H. Corboy and Robert A. Clifford, of counsel), for appellant.

James P. Reedy, of James P. Reedy & Associates, Ltd., of Chicago, for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

A railroad crossing collision involving defendant's locomotive and plaintiff's automobile in the village of Franklin Park, Illinois, resulted in a lawsuit filed by Robert L. Reiss, also the driver of the automobile, against the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Incorporated, as well as individual defendants, George Thomas, engineer of the locomotive and Edward Leaper, locomotive electrician, seeking to recover for personal injuries and property damages occasioned by the alleged negligence and wilful and wanton misconduct of each defendant. Count I of plaintiff's third amended complaint alleged simple negligence. Counts II and III thereof alleged wilful and wanton misconduct, each count being based upon the same alleged actions of defendants, the only difference being that count II contained a prayer for relief in the form of punitive damages, whereas count III sought compensatory damages. The individual defendants were voluntarily dismissed by plaintiff. At the close of plaintiff's evidence, the trial court directed a verdict for defendant railroad as to count II and at the close of all the evidence, verdicts were directed in favor of defendant railroad on the remaining counts. No post-trial motions were filed. No questions are raised on the pleadings.

This appeal is taken from the entry of the directed verdicts in favor of the remaining defendant. Plaintiff seeks reversal of the orders granting the directed verdicts and asks that the cause be remanded for a new trial. For the reasons hereinafter stated, we reverse and remand for a new trial.

The issues identified by the parties are whether: (1) plaintiff was properly found guilty of contributory negligence as a matter of law; (2) plaintiff proved a *prima facie* case on the issue of defendant's alleged wilful and wanton misconduct; and (3) the trial court correctly ruled that punitive damages were not available against a railroad, assuming

evidence supported allegations of defendant's wilful and wanton misconduct.

The accident occurred on December 21, 1972, at approximately 8:40 a.m. when defendant's single, eastbound locomotive collided with the left side center of plaintiff's northbound 1967 Ford Mustang at the Scott Street crossing operated by defendant in Franklin Park. At the site of the accident, Scott Street runs north and south and the railroad tracks run east and west, crossing Scott at right angles. The crossing consists of six sets of tracks owned by defendant, the impact having occurred on the fifth set of tracks north of the most southerly tracks, known as Main Line No. 2. To the south of this crossing are situated two sets of spur tracks which cross Scott Street on a northwest-southeast angle. Several hundred feet south of the crossing is an east-west roadway, Franklin Street, which intersects with Scott Street. Stop signs require north and southbound traffic on Scott to stop for Franklin. Between the spur tracks on the north and Franklin on the south, Scott is bordered on the west by Hartley's Moving and Storage Company truck parking lot and on the east by buildings housing the Hartley Moving and Storage Company business.

Defendant's right-of-way is protected by warning devices equipped with flashing lights, bells and short arm crossing gates. One set of such devices is located in the southeast quadrant of the crossing intended to regulate northbound traffic, and the other set is located in the northwest quadrant, intended to regulate southbound traffic over the crossing. The devices placed in the southeast quadrant are located at the east side of Scott between the northernmost set of spur tracks and the southernmost set of defendant's tracks, approximately 12 feet south thereof. The distance between these devices and the center of Main Line No. 2, at which the accident took place, is approximately 72 feet.

To the right of a northbound motorist the eastward view is blocked by the Hartley buildings up to the spur tracks which are located in the southeast quadrant of the crossing. To the left of a northbound motorist the westward vision is partially blocked by trucks parked in the parking lot. The northernmost edge of the parking lot ends at the spur tracks. A telephone pole stands on the west side of Scott, between the most northerly rail of the spur tracks and the most southerly rail of defendant's tracks.

Plaintiff testified that on the date of the accident he overslept between 45 minutes and one hour, leaving home for work between 8:20 and 8:30 a.m. His health and hearing before the occurrence were good. His motor vehicle was in good operating condition. His home was five blocks from the railroad crossing, four of those being traveled northbound on Scott Street at a speed of from 15 to 20 miles per hour. He

stopped at Franklin Street for the stop sign and proceeded northward to the railroad crossing. He was very familiar with this crossing, having taken this route to work almost daily. He observed that the lights on the southeast quadrant signaling device were not on and the gates were up, as he traveled northward from Franklin. He noticed "quite a few" trucks parked in the Hartley lot on the west side of Scott south of the spur tracks, the nearest being five to 10 feet south of the spur tracks. As he continued northbound he looked to the west but saw no train or locomotive. When his car started to cross the first set of spur tracks it slowed down because he removed his foot from the accelerator but did not step on his brake pedal.

When plaintiff's auto reached approximately the south rail of the first spur tracks, he testified, the lights on the signaling device were not lighted, the gates were up and he heard no ring of a bell. He did not hear a whistle. The windows of his car were up and his radio was on. He glanced to the west and observed the railroad right-of-way for about 50 to 100 feet. When the front end of his car was about even with the signaling devices, he heard a bell and his attention was immediately diverted to the east by its sound. He still heard no whistle. At that time, the car was moving at about 10 to 15 miles per hour and the gates were still up. He looked to the east in the direction of the sound of the bell and saw no trains approaching. His car was still moving and he thereafter looked to the west, at which time he noticed the locomotive involved for the first time as it was hitting his automobile at the driver's door. After the collision, plaintiff observed that the gates at the northwest quadrant of the crossing were up.

On cross-examination plaintiff testified that on the day before the accident his employer had spoken to him about his excessive tardiness. His car came to rest next to and against a shed located in the northeast quadrant of the crossing. He knew the bell he heard was from a railroad crossing warning device and that it signified a train would be coming, but he did not stop. Plaintiff's Exhibit No. 20, a photograph taken at a point just south of the signaling devices in the southeast quadrant of the crossing, depicts an unobstructed view of the west with the exception of a telephone pole, and plaintiff testified that the view therein presented was the same that he had had on the day of the accident. He explained that he kept the car moving and did not apply his brakes when he heard the bell because he didn't expect the train to be right there. Based upon his experience, he believed that when the bell starts ringing, the train is normally a good distance from the crossing. He was not aware that the locomotive would be upon the crossing so quickly. Had he stopped when he heard the bell, the gate in the southeast quadrant would have crashed

down on top of his car. He did not think that he could have stopped in time to avoid the accident, estimating his reaction time at from 3 to 4 seconds.

Called as an adverse witness by plaintiff, George Thomas, the locomotive engineer, testified that at a point approximately 400 to 500 feet west of the west edge of Scott, traveling at a speed of 30 to 35 miles per hour, he observed plaintiff's automobile for the first time. (Pursuant to later questioning by defense counsel, he stated that the gates were down at that time and plaintiff's car was south of the gates.) He looked away for a time and on the second occasion saw plaintiff's car, which was not inside the gates, the locomotive then being between 250 to 300 feet west of the west side of Scott. He did not see plaintiff drive his car around the gates. He applied his brakes. At impact, the locomotive was traveling between 18 and 22 miles per hour.

After the occurrence, Thomas backed the locomotive westward over the crossing in order to test the signal. He first stated that he could not recall the action of the gates on that movement; however, upon being read an excerpt from a deposition, he recalled having stated that the gates did not work on that movement. When he thereafter moved from west to east over the crossing in the test, again he was unable to recall whether the signaling device worked and he agreed having testified at his deposition that the gates were not activated when he came through on that aspect of the test.

During defendant's case, Thomas testified that after he first sighted plaintiff's car he turned to his fireman, Roger Phillips, who was seated on the north side of the engine along with Edward Leaper, the electrician, and Phillips noted that the gates on the north side of the crossing were down. According to Thomas, the locomotive headlight was lighted and he blew the whistle and sounded the bell. When he observed plaintiff's auto for the second time, it appeared to be accelerating. When it appeared to Thomas that plaintiff was trying to race to get across the crossing, he threw his engine into emergency service and applied sand to the tracks.

Roger Phillips, the fireman employed by defendant on the locomotive involved in the accident, was also called as an adverse witness by plaintiff. He testified that as the locomotive was approaching Scott, about 300 feet west of the crossing, he called out that the gates on the north were down and that he had been watching them as they went down. He heard the locomotive whistle blow when it was 150 feet west of the crossing. He was not recalled to testify by defendant.

Another employee, Edward Leaper, defendant's electrician, was called as an adverse witness by plaintiff. He did not see plaintiff's automobile before the collision. He estimated the locomotive speed at

impact to be from 20 to 25 miles per hour. He confirmed that the gates were down at the north side of the crossing when Roger Phillips called out. In a prior discovery deposition, read to him during the course of the trial, he had then testified that the fireman had called out that the gates "were coming down" and that he had noted that "they sure are." He recalled plaintiff stating at the scene that he was late for work and wondered what his boss would say. Leaper was not called as a witness in defendant's case.

Edward Iverson, president of Chucking Machine Products, Inc., a precision machine shop, plaintiff's employer, testified that the normal starting time for all employees was 8 a.m. Plaintiff was late and as a consequence thereof, he might have been docked, but was not in jeopardy of losing his job.

A Franklin Park police sergeant, Jerry Gaida, testified that he was the investigating police officer at the scene of the collision. He noted that the roads were wet and the weather was clear. When he arrived at the scene, the locomotive was 100 feet east of the Scott Street crossing, the gates were up and plaintiff's car was resting against a shed northeast of the crossing. He asked the engineer to conduct a test to determine whether the gates went down because plaintiff told him that the gates were not down when he went through the crossing. When the locomotive backed over the crossing from east to west, the gates went all the way down and when it moved eastward through the crossing the lights began to flash once or twice and the gates came down 1 or 2 feet and then went back up. He noted that the westward vision of a northbound driver on Scott north of Franklin is obstructed by Hartley's trailers on the west side of Scott, and his eastward vision is blocked by buildings from the corner of Franklin and Scott up to where the first spur track is situated. The scope of vision changes as one approaches the crossing: to the south of it, vision is obstructed, but at the warning devices vision is free of obstruction.

On cross-examination Sergeant Gaida stated that the engineer told him the gates had gone down, but plaintiff told him that they had stayed up. He testified that one Walter Hartley was present when he conducted his test. Although he sought to locate Hartley before the trial at plaintiff's request, he discovered Hartley was out of town. Hartley gave him a statement after the accident to the effect that he witnessed the test and when the locomotive was 50 feet from the crossing, the light worked and the gates came down about 2 feet and then went back up, and the engine went through the crossing with the gates up.

For the defense, George Van Dyke testified that he was the signal maintainer for the Scott Street equipment. He arrived at the scene at about 9:30 or 10 a.m. and found that the relay house equipment was in working order. Two days previous to the accident, on December 19, he

had checked the Scott Street equipment and found everything to be in working under.

Also called as a defense witness was Kenneth F. Crouse, trainmaster for defendant on the day of the accident. The Scott Street crossing was at that time included within his area of responsibility. After the accident he had authorized Thomas to back his locomotive westward over the crossing. He did not observe the signal device on the westward movement. He did see that the warning devices operated on the eastward movement of the locomotive, but would not say to the fullest extent because he was then more concerned with the public gathering around the crossing. He did not make a test of the warning devices.

Henry Kruke, a railroad crossing engineer, was called by defendant and was qualified as an expert witness. On the date of the accident he was employed by defendant as a highway grade-crossing engineer. He testified that the Scott Street grade-crossing warning devices were activated by a Marquardt Grade Crossing Predictor. The predictor is connected to the rails just east of the Scott Street crossing and its electric circuiting extends westward a distance of approximately 3,800 feet. When a train or locomotive enters the circuit, a change in electric circuit value in the rails of the track is sent back to the grade-crossing predictor equipment which determines the distance of the train from the crossing, the speed of the train and its timing in approaching the crossing. When that determination is made, the predictor provides a constant time warning for the operation of the flashing light signals and gates and activates the control relay which then operates the flashing lights and gates. In his opinion, the warning devices might not have operated during the post-occurrence test for two reasons: the jarring of the equipment when struck by plaintiff's auto, or the presence of sand on the tracks used in the attempted emergency stop which interferred with the electric circuitry.

On cross-examination Kruke testified that irrespective of the speed of a train approaching Scott from west to east, the approach warning signal time is the same, namely 27 seconds, a constant time to the moment a train will reach the crossing. When a train or locomotive approaches Scott from west to east at approximately 30 to 35 miles per hour, the predictor would activate the warning devices when the train was approximately 1,386 feet west of the crossing.

Evidence with respect to damages was also adduced, but will not be considered here since damages are not at issue in this appeal.

■■ Plaintiff contends that the trial court attempted but failed to apply the standard announced in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, that "* * * verdicts ought to be directed * * * only in those cases in which all of the evidence, when

viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." This is so, he urges, because the record clearly indicates that the court did not consider all of the evidence or properly apply the *Pedrick* standard in finding that plaintiff was guilty of contributory negligence as a matter of law. Plaintiff refers to the trial court's comments concerning the evidence to the effect that: (i) the court was required to consider whether or not plaintiff exercised ordinary care in his actions at the crossing without regard to malfunctioning of the railroad warning devices; (ii) a plaintiff at a railroad crossing has more of a duty to exercise ordinary care because of the hazards presented by the very existence of the crossing itself; (iii) although the gate may not have worked as quickly as it should have under normal circumstances and plaintiff had testified he was already at the gate when he first heard the bell ringing and could do nothing about stopping at that point, plaintiff showed himself to be guilty of contributory negligence as a matter of law; and, (iv) on the question before him on a motion for a directed verdict as to plaintiff's due care and contributory negligence, the court could not in any way relate the conditions of the gates to plaintiff's conduct in coming to its decision. Plaintiff maintains these statements demonstrate that the ruling of the trial court was in contravention of the approach taken in *Pedrick*, in which the supreme court specifically analyzed testimony addressed to the alleged failure of the flashing lights in considering the due care and caution issue.

In addition to *Pedrick*, plaintiff claims the existence of a discernible body of Illinois law which holds that a failure of approach warning devices is relevant evidence on the issue of a plaintiff's due care, citing *Humbert v. Lowden* (1944), 385 Ill. 437, 53 N.E.2d 418; *Grubb v. Illinois Terminal Co.* (1937), 366 Ill. 330, 338, 8 N.E.2d 934, 937; *Applegate v. Chicago & North Western Ry. Co.* (1948), 334 Ill. App. 141, 78 N.E.2d 793; *Urban v. Pere Marquette R.R. Co.* (1930), 266 Ill. App. 152, 161; and *Cohen v. Chicago & North-Western Ry. Co.* (1902), 104 Ill. App. 314. Based upon our examination of the authorities above cited, as well as those cited within the opinions themselves, we conclude that plaintiff's position correctly states the law to be applied under circumstances presented in the instant case. See also *Langston v. Chicago & Northwestern Ry. Co.* (1946), 330 Ill. App. 260, 70 N.E.2d 852, *aff'd* (1947), 398 Ill. 248, 75 N.E.2d 363; *Niemi v. Sprague* (1937), 288 Ill. App. 372, 8 N.E.2d 707.

In *Humbert*, evidence suggesting the failure of a flagman to operate crossing gates in a four-track railroad crossing was considered on the due care issue there presented, the supreme court stating (385 Ill. 437, 443-44):

"Here, for the protection of the public, appellees had erected and maintained crossing gates. *If the gates were not lowered this*

*amounted to an invitation to travelers on the highway. It was an assurance, to them, that they could cross over the railroad tracks in safety. In Chicago and Alton Railroad Co. v. Pearson, 184 Ill. 386, it was said: 'It is not a rule of law that the omission of the duty to look and listen will bar a recovery where there are facts excusing the performance of that duty.' This rule was quoted with approval in Chicago and Eastern Illinois Railroad Co. v. Schmitz, 211 Ill. 446. It was there said that it is a question for the jury to determine whether, in view of all the surroundings, the injured party was guilty of negligence, in failing to look and listen, or whether he is relieved, by the circumstances, from the duty to look and listen. In Chicago and Alton Railroad Co. v. Pearson, 184 Ill. 386, it was also said, that it is the settled rule of this court that it cannot be said, as a matter of law, that a person is in fault in failing to look and listen, if misled without his fault, or where the surroundings may excuse such failure. In support of this rule the court there cited Chicago and Northwestern Railway Co. v. Hansen, 166 Ill. 623; Terre Haute and Indianapolis Railroad Co. v. Voelker, 129 Ill. 540; Chicago and Northwestern Railway Co. v. Dunleavy, 129 Ill. 132, and Pennsylvania Co. v. Frana, 112 Ill. 398. It is a question for the jury to say whether the failure to stop and look is, or is not, negligence. Chicago City Railway Co. v. Barker, 209 Ill. 321." (Emphasis added.)*

In *Grubb*, the supreme court held that a motorist had a duty to look and listen at a railroad crossing, but the fact that the crossing signals did not work was evidence to be considered on the issue of the motorist's due care. In *Applegate*, the appellate court stated that failure of warning signals at a railway crossing is a factor to be considered by a jury in determining whether there was contributory negligence "\* \* \* since the purpose of the signal is not only to warn traffic of the approach of trains, but its non-operation is to assure the traveler that it is safe to cross." (334 Ill. App. 141, 155.) In *Urban*, the alleged signal failure was relevant evidence in analyzing the issue of whether the pedestrian plaintiff who was struck while upon a railroad crossing was guilty of contributory negligence. In *Cohen*, the court held that evidence of the condition of the signal device and gates before and at the time of the accident is relevant to the issue of plaintiff's due care.

■■ ■ The failure of warning signals alone, however, is insufficient to relieve one of the duty to look and listen for an approaching train; other circumstances must also be taken into account. (*Applegate*.) Plaintiff recognizes the foregoing corollary, but insists that the facts in the present case demonstrate the existence of a jury question as to his due care in

addition to the allegedly malfunctioning devices. He points to relative speed and distances of each vehicle in relation to the crossing which are alleged to prove he could not have been "racing" at his thus-computed 10 miles per hour; his experience that more time would elapse before the arrival of the train after the bell started; his fear of the gate crashing down upon his auto, even if he could have stopped, all said to demonstrate that here "* * * the course of safety * * * [was] different * * * [and] what is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury," citing *Pokora v. Wabash Ry. Co.* (1934), 292 U.S. 98, 105-06, 78 L. Ed. 1149, 54 S. Ct. 580. Plaintiff further argues that the tracks east and west of the crossing were partially obstructed by the truck parking area to the west and the buildings to the east. Relying on *Hughes v. Wabash R.R. Co.* (1950), 342 Ill. App. 159, 95 N.E.2d 735, plaintiff reasons that his being in a moving vehicle, where his view westward did not become unimpeded until he reached the area of the crossing, and his reaction time, plus the preceding facts enumerated, were all circumstances material to the question of his due care, which created a fact question for a jury rather than a question of law for the court. We agree.

■ Under the foregoing evidence, defendant misplaces reliance upon the proposition that a plaintiff must prove himself free from contributory negligence before he can recover damages even though the other party is clearly negligent, regardless of whether the crossing was extra hazardous, citing *Jellen v. New York, Chicago & St. Louis R.R. Co.* (1964), 53 Ill. App. 2d 44, 202 N.E.2d 665; *Herglund v. New York, Chicago, & St. Louis, R.R. Co.* (1971), 1 Ill. App. 3d 968, 274 N.E.2d 671; *Coleman v. Illinois Central R.R. Co.* (1974), 59 Ill. 2d 13, 319 N.E.2d 228; *Swenson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.* (1949), 336 Ill. App. 287, 83 N.E.2d 375; *Niederle v. Chicago Rapid Transit Co.* (1932), 264 Ill. App. 347; *Shaw v. Chicago & Eastern Illinois R.R. Co.* (1947), 332 Ill. App. 285, 75 N.E.2d 51; *Moudy v. New York, Chicago & St. Louis R.R. Co.* (1944), 385 Ill. 446, 53 N.E.2d 406; *Robertson v. New York Central R.R. Co.* (1944), 388 Ill. 580, 58 N.E.2d 527; *Willett v. Baltimore & Ohio Southwestern R.R. Co.* (1936), 284 Ill. App. 307, 1 N.E.2d 748; *Overman v. Illinois Central R.R. Co.* (1962), 34 Ill. App. 2d 30, 180 N.E.2d 213; and *Tucker v. New York, Chicago & St. Louis R.R. Co.* (1957), 12 Ill. 2d 532, 147 N.E.2d 376. Our examination of the foregoing authorities reveals that they are factually inapposite. In each of those cases, except for *Niederle*,[1] the railroad crossings involved in the respective accidents were not

[1] In *Niederle*, the crossing was guarded by an allegedly malfunctioning warning device upon which reliance was placed by plaintiff in that case. Disputed questions of alleged malfunctioning went to the jury which found for defendant and was upheld on appeal.

guarded by any operating warning devices which allegedly failed to function properly, as claimed by plaintiff in the instant case, but in each simple cross-buck railroad signs were placed at the crossings which devolved upon the highway travelers somewhat different burdens, particularly with respect to the issue of their own due care.[2] This difference, alluded to in *Humbert* and cases which followed, was again noted in *Coleman,* cited by defendant, in which the supreme court stated (59 Ill. 2d 13, 17):

> "In prior decisions this court has consistently recognized the rule of law that railroad crossings are dangerous places and that in crossing them a person must exercise a degree of care commensurate with the danger to be anticipated. (*Tucker v. New York, Chicago and St. Louis R.R. Co.*, 12 Ill. 2d 532, 534; *Moudy v. New York, Chicago and St. Louis R.R. Co.*, 385 Ill. 446, 452.) Ordinarily a person traversing a crossing without stopping to look and listen for approaching trains is, as a matter of law, contributorily negligent. *However, where the view of the crossing is obstructed or where the plaintiff is distracted or misled without his fault, his failure to look or listen may be excused. In such instances, it is for the finder of fact to determine whether he acted prudently. Tucker v. New York, Chicago and St. Louis R.R. Co.*, 12 Ill. 2d 532; *Humbert v. Lowden*, 385 Ill. 437; *Gills v. New York, Chicago and St. Louis R.R. Co.*, 342 Ill. 455.
>
> Our examination of those cases holding that a plaintiff who failed to look and listen for an approaching train was not contributorily negligent as a matter of law leads us to the conclusion that they are not applicable here. In *Humbert v. Lowden*, upon which plaintiff heavily relies, there was evidence that crossing gates and crossing bells did not function prior to the collision. The court held that it was for the jury to decide whether the plaintiff's failure to look was excused by the malfunction of those warning devices." (Emphasis added.)

From the foregoing it is clear that the evidence relating to the alleged malfunctioning of the warning devices in the present case should have been considered in the trial court's determination of whether plaintiff here was guilty of contributory negligence as a matter of law together with other evidence of his due care; its failure to do so, and to submit that question to the jury, was error requiring that this cause be reversed and remanded for a new trial.

Plaintiff also claims error in the trial court's ruling that there was no evidence of defendant's alleged wilful and wanton conduct in view of the

---

[2] In *Coleman* an operating device faced oncoming traffic only.

testimony purportedly demonstrating that: (1) defendant failed to exercise sufficient precautions which would have enabled motorists to ascertain the approach of a train, citing *Maltby v. Chicago Great Western Ry. Co.* (1952), 347 Ill. App. 441, 106 N.E.2d 879; (2) the circumstances attending the crossing, *i.e.*, multiple warning failures, obstructions and distractions constituted such evidence, citing *Churchill v. Norfolk & Western Ry. Co.* (1977), 46 Ill. App. 3d 781, 362 N.E.2d 356; and (3) defendant violated Illinois Commerce Commission General Order No. 138, Rule 305, in having failed to give a 20-second train approach warning via its signaling devices, said violation also allegedly constituting a statutory violation, citing section 73 of "An Act concerning public utilities" (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 77). Plaintiff ascribes to the foregoing examples of defendant's conduct *prima facie* conscious disregard or utter indifference to the safety of others.

Defendant responds by pointing to evidence showing that: the railroad at no time knew of any malfunctioning of the gates which had in fact been inspected just two days before the accident and found to be in working order; the evidence reveals proper regard for the safety of human life and property on defendant's behalf in having given a warning of the approach of its train by use of its whistle, bell and headlights; and the moderate speed at which the locomotive was traveling, and proper lookout, citing *Herglund v. New York, Chicago, & St. Louis, R.R. Co.* (1971), 1 Ill. App. 3d 968, 274 N.E.2d 671, and *Robertson v. New York Central R.R. Co.* (1944), 388 Ill. 580, 58 N.E.2d 527. Defendant distinguishes both *Maltby* and *Churchill* in that *Maltby* involved a complete failure by the railroad to give any warning whatsoever and in *Churchill*, the auto there involved was left stranded on the tracks, a factual situation clearly distinguishable from that obtaining in the case at bar.

■■ With respect to plaintiff's subpoints (1) and (2), we believe that the record shows sufficient ground for the dismissal of count II; however, in regard to alleged violations of the Illinois Commerce Commission order and the statutory provision cited, if plaintiff can demonstrate a knowing or wilful disregard of the 20-second rule on the part of the railroad, such conduct should be considered by the jury in making its determination as to whether defendant was guilty of wilful and wanton conduct. For this reason, the trial court's ruling with respect to the question of evidence of defendant's alleged wilful and wanton conduct should not have been directed as a matter of law. This order, therefore, must also be reversed.

For his next point plaintiff assigns error to the trial court's ruling that punitive damages were not available in a railroad-crossing collision case alleged to have been caused by defendant's wilful and wanton conduct. Defendant cites no authority which would preclude imposition of punitive damages in a railroad-crossing accident, but argues the absence

of evidence which would demonstrate the wilful violation of the above cited order and rule. Wilful and wanton conduct by a defendant may be amenable to punitive damages in a proper case (see, *e.g.*, *Chicago Consolidated Traction Co. v. Mahoney* (1907), 230 Ill. 562, 82 N.E. 868; *Madison v. Wigal* (1958), 18 Ill. App. 2d 564, 153 N.E.2d 90; *Southern Pacific Transportation Co. v. Luck* (1975), 111 Ariz. 560, 535 P.2d 599). In light of our ruling concerning the possibility of a finding by a jury of wilful and wanton conduct by virtue of the violations of an administrative order and statute, we believe that the question of punitive damages should also be submitted to the jury.

For the above and foregoing reasons, the orders of the trial court directing verdicts in defendant's favor are reversed and the cause is remanded for a new trial.

Reversed and remanded.

STAMOS, P. J., and DOWNING, J., concur.